**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | ) | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal No. 15-cr-125 (KBJ) |
| | ) | |
| MORRIS GEMAL JOHNSON, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION DENYING DEFENDANT'S MOTION FOR NEW TRIAL

At the end of a seven-day trial, a jury deliberated for less than two hours before it found defendant Morris Gemal Johnson guilty of all of the charges against him: two counts of Unlawful Receipt or Possession of an Unregistered Firearm and Destructive Device, in violation of 26 U.S.C. §§ 5861(d), 5871; two counts of Unlawful Making of a Firearm, in violation of 26 U.S.C. §§ 5861(f), 5871; two counts of Possession of a Weapon of Mass Destruction, in violation of 22 D.C. Code § 3154(a); and one count of Conspiracy to Smuggle Goods into the United States, in violation of 18 U.S.C. § 371. (*See* Verdict Form, ECF No. 143.)   Through sixteen witnesses and myriad exhibits, the government presented extensive evidence that Johnson made and possessed two improvised explosive devices ("IEDs") and conspired to smuggle machine guns, machine gun parts, and silencers into the United States.[1]   Johnson presented two

---

[1.] Among other things, the government introduced physical evidence that federal agents had seized from Johnson's home, including the two IEDs themselves (Government Exhibits 300 and 301), component parts for making such devices, tools, and detailed, written instructions for manufacturing IEDs.   The government also offered the testimony of Swedish law enforcement witnesses and email correspondence that had been retrieved from the electronic devices of codefendant Raimo Huolman, a Swedish national, in which Johnson ordered machine guns, parts, and silencers and confirmed receipt of prior orders.   In addition, the government's case relied on evidence from Johnson's seized electronic devices, which revealed Johnson's research into how to acquire parts for, build, and deploy improvised

witnesses—an explosives expert and his mother—and nothing that defense counsel presented, whether through cross-examination or the affirmative admission of evidence, meaningfully challenged the credibility of the government's witnesses or attacked the substance of the government's proof.

Before this Court at present is Johnson's motion for a new trial. (*See* Def.'s Mot. For New Trial ("Def.'s Mot."), ECF No. 155.) Johnson makes two arguments in support of his motion. First, Johnson argues that the government failed to prove that the charged IEDs were unlawful either under federal law or under District of Columbia law, because the government relied "only" on evidence that a mousetrap could render the devices functional. (*See id.* at 9; *see also id.* at 2-13.)[2] Second, Johnson generally and summarily requests reconsideration of this Court's denial of his motion for severance of the conspiracy count from the counts related to the possession and manufacture of the IEDs. (*See id.* at 13.) The government filed an opposition to Johnson's motion for a new trial (*see* Gov't's Opp'n to Def.'s Mot., ECF No. 162); however, defense counsel did not opt to file a reply (*see generally* Docket).

For the reasons explained below, Johnson's motion for a new trial will be **DENIED**.

## I.

Federal Rule of Criminal Procedure 33(a) provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of

---

explosive devices, and verified Johnson's communications with Huolman and his purchases on Huolman's website.

[2] Page numbers herein refer to those that the Court's electronic case-filing system automatically assigns.

justice so requires." Fed. R. Crim. P. 33(a). The D.C. Circuit has explained that a new trial "is warranted only in those limited circumstances where 'a serious miscarriage of justice may have occurred.'" *United States v. Wheeler*, 753 F.3d 200, 208 (D.C. Cir. 2014 (quoting *United States v. Rogers*, 918 F.2d 207, 213 (D.C. Cir. 1990)). In considering a motion for a new trial, this Court sits as a "thirteenth juror," and thus may weigh the evidence and consider witness credibility in light of its observations during the trial. *See Tibbs v. Florida*, 457 U.S. 31, 38 n.11, 42 (1982). It is the defendant's burden to "overcome [the] strong presumption . . . in favor of upholding the jury verdict." *Rogers*, 918 F.2d at 213 (internal quotation marks and citation omitted).

## II.

The jury in the instant case convicted Johnson of six counts related to the two IEDs, including two counts of possession of a weapon of mass destruction in violation of District of Columbia law. (*See* Verdict Form, Counts 3 (Exhibit 300) and 6 (Exhibit 301).) Section 22-3154(a) of the D.C. Code makes it unlawful to possess "a weapon of mass destruction capable of causing multiple deaths, serious bodily injuries to multiple persons, or massive destruction of property[.]" D.C. Code § 22-3154(a). The D.C. Code further defines a weapon of mass destruction as

> (A) Any destructive device that is designed, intended, or otherwise used to cause death or serious bodily injury, including:
>
>     (i) An explosive, incendiary, or poison gas:
>
>         (I) Bomb;
>
>         (II) Grenade;
>
>         (III) Rocket;

3

> > (IV) Missile;
> >
> > (V) Mine; or
> >
> > (VI) Device similar to any of the devices described in the preceding clauses;
>
> > (ii) A mortar, cannon, or artillery piece; or
>
> > (iii) Any combination of parts either designed or intended for use in converting any device into a device described in sub-subparagraphs (i) through (iii) of this paragraph and from which such device may be readily assembled;
>
> (B) An object similar to or used to achieve the same destructive effect of any of the devices described in subparagraph (A) of this paragraph
>
> . . .

D.C. Code § 22-3152(12). Significantly for present purposes, the District of Columbia Court of Appeals has made clear that a device need not be a functioning weapon of mass destruction in order to fall within the meaning of the statute so long as it "could readily [be] converted" into a weapon with the requisite capabilities. *See Gorbey v. United States*, 54 A.3d 668, 702 (D.C. 2012) (finding that a small improvised explosive device without the fusing system needed to detonate it nevertheless qualified as a "weapon of mass destruction" as defined by D.C. Code § 22-3154).

In addition to the two weapons of mass destruction counts, the jury also convicted Johnson of two counts of unlawful possession of an unregistered firearm (*see* Verdict Form, Counts 1 (Exhibit 300) and 4 (Exhibit 301)) and two counts of unlawful making of a firearm, in violation of federal law (*see id.* Counts 2 (Exhibit 300) and 5 (Exhibit 301)). By statute, a prohibited firearm within the meaning of federal law includes a "destructive device," which, as relevant here, is defined as:

4

> (1) any explosive, incendiary, or poison gas (A) bomb, (B) grenade, . . . (E) mine, or (F) similar device; (2) any type of weapon by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, the barrel or barrels of which have a bore of more than one-half inch in diameter, . . . ; and (3) any combination of parts either designed or intended for use in converting any device into a destructive device as defined in subparagraphs (1) and (2) and from which a destructive device may be readily assembled.

26 U.S.C. § 5845(f). Thus, the federal statutory definition of destructive device is quite similar to the definition of weapon of mass destruction in the D.C. Code, but the former does not explicitly require that the device be capable of death or serious bodily injury. And, like the D.C. Court of Appeals, federal courts have consistently concluded that the definition of destructive device includes a nonfunctional device or a combination of parts that can quickly and easily be converted into a functional destructive device. *See, e.g.*, *United States v. Kirkland*, 909 F.3d 1049, 1053 (9th Cir. 2018) (finding that a homemade bomb fell within the meaning of 26 U.S.C. § 5845(f), even though the device needed eight batteries to be detonated, in part because batteries are common household items 'readily available to an ordinary consumer'"); *United States v. Sheehan*, 838 F.3d 109, 125 (2d Cir. 2016) (affirming a conviction under 26 U.S.C. 5845(f) where the destructive device required tape to be functional).

### III.

Johnson's motion purports to impugn the evidence at trial as to both the District of Columbia and federal counts in relation to the charged IEDs generally (*see* Def.'s Mot. at 2, 13), but his motion is focused almost entirely on the requirement, under D.C. law, that a weapon of mass destruction be "capable" of certain destructive capacities; indeed, the motion addresses the federal definition of destructive device only in a

5

footnote (*see id.* at 12 n.6.). Moreover, Johnson argues that "[t]he government only achieved the element of capability by introducing testimony that a mousetrap could initiate the primer." (Def.'s Mot. at 9; *see also id.* at 8 ("Defendant submits that the government's entire theory of capability rested upon the expert's testimony that a mousetrap could initiate the primer."); *id.* at 11.) This Court can dispose of this argument in short order without evaluating defense counsel's questionable suggestion that a mousetrap theory of detonation cannot support the D.C. Code's "capability" requirement as a matter of law because the premise of Johnson's argument is woefully mistaken: contrary to his assertions, the government did, in fact, introduce uncontradicted evidence during trial that both IEDs could be "capable" of causing death and serious bodily injury *in several different ways*, and thus, the jury had multiple bases upon which to find that the devices at issue satisfy the statutory definition.

To be specific, the government's explosives expert—Bureau of Alcohol, Tobacco, and Firearms Explosives Enforcement Specialist Danny Waltenbaugh—testified for the better part of a day about the explosive and destructive capability of both improvised explosive devices. (*See* Trial Transcript ("Tr.") at 1040-1203.) Waltenbaugh testified that the first device, which the government introduced as Exhibit 300, was a fully functional explosive device capable of causing multiple deaths or serious bodily injuries. In particular, Waltenbaugh testified that the device's inner projectile could be easily removed from its outer cartridge and lit by fire (*see id.* at 1062:20-1063:5; 1065:20-1066:4; 1074:1-20 ), and that such an act would result in an "explosion [that] would cause the plastic [casing] to fragment in all directions and would cause the projection of the small metal flechettes and darts and the metal balls to

then be projected in many different directions" (*id.* at 1072:2-8). Waltenbaugh also explicitly stated that the device itself was capable of causing such destruction—i.e., no additional components were needed to detonate the device. (*Id.* at 1075:3-5; *see also id.* at 1161:5-16; 1164:1-9.) Waltenbaugh further detailed the horrific injuries (up to and including death) that such detonation could cause. (*Id.* at 1081:10-1083:13.) Given this evidence, there is no question that the government presented ample and unchallenged proof that Exhibit 300 qualified as a "bomb" or "grenade" capable of causing "multiple deaths" or "serious injuries to multiple persons" within the meaning of D.C. law. *See* D.C. Code §§ 22-3154(a), 3152(12). And this same evidence established that Exhibit 300 was a bomb or grenade within the meaning of federal law. *See* 26 U.S.C. § 5845(f).

As to the second device, which the government introduced as Exhibit 301, Waltenbaugh testified that it could readily be converted into a functional explosive device capable of causing multiple deaths and serious injuries. For example, when asked what would be needed to detonate Exhibit 301 as an improvised mine, Waltenbaugh explained:

> Some kind of small component that could be literally glued or attached to the primer and a hard surface. So, for example, it could be placed in the ground with sufficient space and distance so that on the ground a hard surface underneath it and a small piece on this primer, that when stepped on or impacted with sufficient energy would cause this primer to initiate causing the metal to be projected directly up.

(*Id.* at 1101:7-13.) Waltenbaugh further testified that the device was easy to convert into a functional explosive, insofar as a person could simply tape or glue one of the metal BBs found within the device to the primer and "take [the device] in their hand

7

and smack it against a hard surface." (*Id.* at 1202:3-4; *see also* 1103:12-1104:5; 1201:9-1202:10.)

Notably, Waltenbaugh first mentioned a mousetrap as just one example of the many ways in which Exhibit 301 could be detonated. (*Id.* at 1091:4-11.) Waltenbaugh further testified that Exhibit 301 could be detonated using a hammer (*id.* at 1091:7-11), and Johnson's own expert, Vincent DiRicco, testified that the device could be detonated using a nail (*id.* at 1246:1-13).[3] Both experts also agreed that Exhibit 301 could be detonated using a launcher (*see, e.g.*, *id.* at 1089:22-1090:1 (Waltenbaugh); 1250:25-1251:4 (DiRicco)), and the government introduced evidence that not only had Johnson contacted Huolman about a launcher (*see, e.g.*, *id.* at 1105:4-21), he was also researching launchers online (*see, e.g.*, *id.* at 1127:12-17). Furthermore, just as with Exhibit 300, Waltenbaugh testified that Exhibit 301 was capable of causing extreme injuries up to and including death. (*See id.* at 1098:1-1100:25.)

Thus, there was strong and uncontested evidence that Exhibit 301 fit within the D.C. definition of weapon of mass destruction, because it qualified as a "combination of parts either designed or intended for use in converting any device into [an explosive mine] . . . and from which such device may be readily assembled[.]" *See* D.C. Code § 22-3152(12). Moreover, and for these same reasons, the government demonstrated that

---

[3] Johnson acknowledges that Waltenbaugh and DiRicco "were for the most part consistent with each other." (Def.'s Mot. at 8.) To any extent that DiRicco disagreed with Waltenbaugh, the Court finds that DiRicco's testimony cannot be credited because, during his testimony, DiRicco repeatedly explained that his area of expertise was in professionally manufactured ammunition and explosives used in the military, and not in the kinds of improvised explosive devices at issue in this case. (*See* Tr. at 1214:14-1220:14; 1239:3-1240:5; 1244:23-1245:1.) Indeed, DiRicco admitted that he had limited knowledge of improvised explosive devices and the applicable laws, and thus his testimony was almost entirely irrelevant. (*See id.* at 1240:9-1243:1.)

Exhibit 301 was a prohibited destructive device under federal law. *See* 26 U.S.C. § 5845(f).

In sum, Johnson's motion for a new trial on the six counts related to the two IEDs is premised on the faulty notion that the government pursued only a "mousetrap" theory of detonation with respect to the charged devices, and, therefore, granting Johnson's motion would require the Court to ignore or discount the bulk of the government's evidence at trial. Johnson provides no basis for doing so, and the Court has little doubt that he has failed to meet his heavy burden of demonstrating that there was a miscarriage of justice such that the jury's verdict should be overturned.

**IV.**

Johnson's motion for a new trial also contains the following one-sentence statement: "Defendant repeats all previous arguments related to severance of counts and incorporates all arguments made prior to trial and during trial into his Motion for New Trial and respectfully requests reconsideration of the arguments within the context of this Motion." (*See* Def.'s Mot. at 13.) Johnson offers no additional argument or elaboration. And this Court declines to revisit the severance dispute, much less overturn the jury's verdict on that basis. The Court's ruling on severance was stated fully and on the record (*see* Tr. of June 15, 2017 Status Conference (denying severance based on overlapping evidence and lack of prejudice); Tr. at 1205:5-23 (repeating denial of severance based on overlapping evidence and lack of prejudice)); for present purposes, the Court incorporates all of the findings it previously made in the context of the instant Memorandum and relies upon them as its reasons for denying this aspect of Johnson's motion for a new trial.

**IV.**

In conclusion, after observing the evidence presented at Johnson's trial and reviewing Johnson's motion, this Court rejects defense counsel's contention that a new trial would be "in the interest of justice." *See* Fed. R. Crim. P. 33(a). Therefore, as set forth in the accompanying Order, Johnson's motion will be **DENIED**.

DATE: August 15, 2019         <u>Ketanji Brown Jackson</u>
                              KETANJI BROWN JACKSON
                              United States District Judge