IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | No. 15-cr-125 (KBJ) |
| ) | |
| MORRIS GEMAL JOHNSON, ) | |
| ) | |
| *Defendant*. ) | |

## MOTION FOR COMPASSIONATE RELEASE PURSUANT TO 18 U.S.C. § 3582

Defendant Morris Gemal Johnson moves for compassionate release to home confinement pursuant to Section 603(b) of the FIRST STEP Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194 (2018) (codified at 18 U.S.C. § 3582), in light of the extraordinary health risks posed by the COVID-19 pandemic—risks that are heightened for Mr. Johnson due to his underlying health conditions. Although Mr. Johnson requested that the Bureau of Prisons file a motion for compassionate release on his behalf, as required by 18 U.S.C. § 3582(c)(1)(A), the Bureau rejected that request on the ground that Mr. Johnson, who is housed at the D.C. Jail's Correctional Treatment Facility, is not currently in Bureau of Prisons custody. Having now exhausted his administrative remedies, and in light of the deteriorating conditions at the Correctional Treatment Facility recently documented in a report issued by court-appointed inspectors, Mr. Johnson brings this motion for a reduced sentence and respectfully requests that it be considered on an expedited basis. For the reasons that follow, this Court should grant the motion.

Undersigned counsel conferred with counsel for the Government on April 20, and is authorized to state that the Government opposes this motion.

## FACTUAL AND PROCEDURAL BACKGROUND

On November 19, 2019, this Court sentenced Mr. Johnson to 41 months' imprisonment and 60 months' supervised release for weapons-related offenses. (ECF No. 183.) With credit for the time that Mr. Johnson began serving after trial (and taking into account good-time credit), he is now set to be released in less than two years, on March 13, 2022. *See Inmate Locator*, Fed. Bureau of Prisons, https://www.bop.gov/inmateloc (No. 44698-083). Because of the COVID-19 pandemic, however, the remainder of Mr. Johnson's incarceration comes with the risk of serious illness or death.

The increased risk that COVID-19 poses to inmates and prison staff has been well documented in recent weeks. As Judge Kollar-Kotelly recently observed in a case concerning conditions at the D.C. Jail, "[t]he risk posed by infectious diseases in jails and prisons is significantly higher than in the community, both in terms of the risk of transmission, exposure, and harm to individuals who become infected." Mem. Op., *Banks v. Booth*, No. 20-cv-849 (CKK), ECF No. 49, at 8 (D.D.C. Apr. 19, 2020) (quoting Decl. of Jaimie Meyer, ECF No. 5-2, ¶ 9) ("*Banks* Mem. Op."); *see also, e.g.*, *United States v. Harris*, No. 19-cr-356 (RDM), 2020 WL 1503444, at *2 (D.D.C. Mar. 27, 2020) ("COVID-19 poses a unique and serious risk to inmates and workers in detention facilities." (internal quotation marks omitted)); Timothy Williams et al., *Jails Are Petri Dishes: Inmates Freed as the Virus Spreads Behind Bars*, N.Y. Times (Mar. 30, 2020), http://nytimes.com/2020/03/30/us/coronavirus-prisons-jails.html.

But even compared to other disease outbreaks in prison facilities, the spread of the coronavirus through the D.C. jail system—and the Correctional Treatment Facility in particular—stands out. The D.C. Department of Corrections ("DOC") reported its first confirmed case of an inmate with COVID-19 on March 26, 2020; like Mr. Johnson, that inmate was housed at the

Correctional Treatment Facility, and 36 inmates in the same facility were soon placed in quarantine. *See* Keith L. Alexander, *After D.C. Jail Confirms First Inmate with Covid-19, Officials Isolate 36 Other Inmates*, Wash. Post (Mar. 26, 2020), https://www.washingtonpost.com/local/public-safety/after-dc-jail-confirms-first-inmate-with-covid-19-officials-isolate-36-other-inmates/2020/03/26/4610cd86-6f68-11ea-b148-e4ce3fbd85b5_story.html.  By April 6, 2020, corrections officials reported that 20 D.C. inmates had tested positive for COVID-19, a five-fold increase within a week.  *See* Notice Regarding Additional COVID-19 Cases in DOC Custody, *Banks* ECF No. 31 (D.D.C. Apr. 6, 2020).  That figure has markedly increased over the last two weeks.  As of April 16, 65 inmates have tested positive for COVID-19; 57 (88%) of whom are, like Mr. Johnson, housed in the Correctional Treatment Facility.  *See* Report Submitted by *Amicus Curiae* Pursuant to April 9, 2020 Consent Order, *Banks* ECF No. 47 at 5 (D.D.C. Apr. 19, 2020) ("*Banks* Inspector Report").  Put otherwise, fifteen percent of the inmates in the Correctional Treatment Facility are now *confirmed* carriers of the virus.  *See id.*  One Correctional Treatment Facility inmate and one DOC correctional staff member have died as a result of COVID-19.  *See id.* at 5–6.[1]

The rapid spread of COVID-19 in the D.C. Jail can be attributed to several factors, including staffing shortages relative to the inmate population; inadequate sanitation; and a lack of testing capacity.  *See Banks* Mem. Op. at 8–9, 16–24.[2]  As of April 10, approximately one-third of

---

[1] Mr. Johnson reports that the inmate who died was housed in the same cell block or "unit" as Mr. Johnson until shortly before his death.

[2] These conditions led the union representing corrections officers at the D.C. Jail to file a lawsuit alleging that the Department of Corrections has taken insufficient COVID-19 safety precautions. *See* Natalie Delgadillo, *Correctional Officers Sue D.C., Alleging Deadly Risk of Working in the Jail During a Pandemic*, DCist.com (Apr. 16, 2020), https://dcist.com/story/20/04/16/correctional-officers-sue-d-c-alleging-deadly-risk-of-working-in-the-jail-during-a-pandemic/.

the total funded correctional workforce was unavailable to report for work. *See Banks* Inspector Report at 21. That shortfall, in turn, has created "a supervision deficient," which has led to a "failure to enforce social distancing requirements." *Id.*; *see also id.* at 34 ("It appears that the DOC does not have sufficient line and supervisory staff available to appropriately enforce social distancing policies."). For example, a recent inspection of the facilities revealed that:

> More than five inmates were consistently out of their cells at one time, and sometimes between 10 and 20 inmates were out of their cells at one time …. Social distancing practices were not enforced and there were no attempts by the correctional staff to enforce social distancing even when numerous inmates crowded into a contained area…. [And there were] numerous instances in which correctional officers assigned to housing units left their posts without relief, leaving housing units short staffed.

*Id.* at 20, 34.

Numerous sanitation issues have also been documented. During the inspectors' visit in connection with the *Banks* litigation, no inmate was seen with a facility-issued rag. Instead, inmates were cleaning their cells with "tattered and soiled" "make-shift rags," and in one unit, "all of the cleaning supplies had been depleted." *Id.* at 30. Common areas fared little better:

> Inmate detail workers clean the common areas in the housing units. They have not been adequately trained and are not appropriately supervised … [and] the efficacy of the[ir] efforts is undermined by inadequate training, limitations in supervision, the absence of any quality controls, and the apparent limitations in the equipment and possibly in the cleaning and disinfecting agents that they are using.

*Id.* at 32–33. Further, "[t]here is no evidence that hand sanitizer is provided to the inmates at either the [Central Detention Facility] or the [Correctional Treatment Facility]." *Id.* at 33. And, although inmates in the quarantine units are required to wear masks, in some instances, the masks were "ill-fitting, visibly soiled, and ripped." *Id.* at 18.

Finally, despite *at least* 15 percent of the Correctional Treatment Facility population having already contracted the virus, regular testing of inmates has not been instituted. It is well-documented that COVID-19 can be spread by asymptomatic carriers; indeed, according to the

Director of the Centers for Disease Control and Prevention, "as many as 25%" "of individuals that are infected actually remain asymptomatic." *CDC Director on Models for the Months to Come*, NPR (March 21, 2020), https://www.npr.org/sections/health-shots/2020/03/31/824155179/cdc-director-on-models-for-the-months-to-come-this-virus-is-going-to-be-with-us.[3]   But at Correctional Treatment Facility, although some inmates' "temperatures [are being taken] twice daily," testing appears to occur only after an inmate is "identified as having symptoms." *Banks* Inspector Report at 9.  Moreover, "only inmates who have tested positive for COVID-19 are housed in isolation units." *Id.* at 13.  Judge Kollar-Kotelly has described the apparent lack of "steps being taken to prevent the spread of COVID-19 by those inmates who . . . have not yet tested positive for infection" as "especially concerning." *Banks* Mem. Op. at 19.

Mr. Johnson is a particularly vulnerable member of the Correctional Treatment Facility population.  In particular, he suffers from high blood pressure and obesity, both of which are directly linked to an increased risk of developing severe coronavirus symptoms.[4]  *See* Roni Caryn Rabin, *Obesity Linked to Severe Coronavirus Disease, Especially for Younger Patients*, N.Y. Times (Apr. 16, 2020), https://www.nytimes.com/2020/04/16/health/coronavirus-obesity-higher-

---

[3] More recent studies suggest that asymptomatic carriers may be even more prevalent. For example, the U.S. Navy recently tested nearly all the personnel aboard the U.S.S. Theodore Roosevelt, an aircraft carrier affected by a COVID-19 outbreak.  Secretary of Defense Mark Esper indicated that, of the more than 600 personnel who tested positive, approximately 60 percent never had any visible symptoms, and many of them "ha[d] no idea whatsoever that they are carrying it."  Ryan Pickrell, *Sweeping US Navy Testing Reveals Most Aircraft Carrier Sailors Infected With Coronavirus Had No Symptoms*, Business Insider (Apr. 17, 2020), https://www.businessinsider.com/testing-reveals-most-aircraft0-carrier-sailors-coronavirus-had-no-symptoms-2020-4.

[4] According to the October 18, 2019, Pre-Sentence Report ("PSR") (ECF No. 172 ¶ 76), Mr. Johnson was diagnosed with hypertension (i.e., high blood pressure) in 2007.  In addition, the PSR states that Mr. Johnson is 5 foot 11 inches tall and weighs 220 pounds, corresponding to a body-mass index ("BMI") of 30.7, which is considered obese (BMI > 30).  (*Id.* ¶ 75.)  *See Calculate Your Body Mass Index*, U.S. Dep't of Health & Human Servs., Nat'l Heart, Lung & Blood Instit., https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm.  Mr. Johnson reports that he now weighs approximately 270 pounds, which would result in an even higher BMI.

risk.html; *Keeping a Lid on Blood Pressure During the Coronavirus*, Am. Heart Ass'n (Apr. 7 2020), https://www.heart.org/en/coronavirus/coronavirus-covid-19-resources/keeping-a-lid-on-blood-pressure-during-the-coronavirus-crisis ("Am. Heart Ass'n Rec.") ("[E]arly findings suggest high blood pressure . . . could raise your risk of experiencing severe complications from the coronavirus regardless of your age."). It is also becoming increasingly clear that the virus can inflict psychological harms, which will fall hardest on inmates who, like Mr. Johnson, suffer from mental health disorders such as post-traumatic stress disorder ("PTSD"). (ECF No. 195 at 17.) *See* Hao Yao, Jian-Hua Chen, & Yi-Feng Xu, *Patients with Mental Health Disorders in the COVID-19 Epidemic*, 7:4 The Lancet Correspondence (Apr. 2020). Furthermore, in light of ongoing studies that continue to reveal new COVID-19 risk factors, it bears noting that Mr. Johnson has a history of other health conditions, including sleep apnea.[5] (ECF No. 172 ¶ 76.) *See Sleep Apnea*, Mayo Clinic (July 25, 2018), https://www.mayoclinic.org/diseases-conditions/sleep-apnea/symptoms-causes/syc-20377631 ("Sleep apnea is a serious medical condition [with] [c]omplications [that] can include . . . [h]igh blood pressure or heart problems.").

The risks to Mr. Johnson's health are not merely theoretical. Although counsel have been unable to visit Mr. Johnson—and, despite significant outreach to D.C. Jail officials, unable to make or schedule calls to Mr. Johnson to discuss his pending D.C. Circuit appeal or this motion[6]—

---

[5] In addition, Mr. Johnson is African-American, and early data have shown that racially "disparate rates of sickness—and death—have emerged in some places." John Eligon, Audra D. S. Burch, Dionne Searcey, and Richard A. Oppel, Jr., *Black Americans Face Alarming Rates of Coronavirus Infection in Some States*, N.Y. Times (Apr. 7, 2020), https://www.nytimes.com/2020/04/07/us/coronavirus-race.html (last updated Apr. 14, 2020).

[6] Following extensive correspondence with D.C. Jail officials, counsel was informed on April 7 that the only available means of speaking with Mr. Johnson are to visit him in person or wait for him to call counsel during his limited "rec" periods, which do not follow a regular schedule. On or about April 4, the Jail adopted a policy prohibiting all "visits with attorneys unless actively in trial," *Medical Stay-In-Place*, D.C. Dep't of Corrections (Apr. 4, 2020), https://doc.dc.gov/page/coronavirus-prevention, although that policy may no longer be in force.

counsel understands that three weeks ago, Mr. Johnson and the rest of his unit were placed in quarantine after several inmates in the unit tested positive for COVID-19. Nevertheless, Mr. Johnson reports that he has been provided with no gloves and only two masks to use during the quarantine, and that he has limited access to soap, hand sanitizer, and cleaning supplies. What is more, despite the quarantine, Mr. Johnson reports that he has been unable to practice proper social distancing. For example, as of approximately April 17, Mr. Johnson was still being taken to his daily 30-minute recreation period with a group of approximately nine other inmates. Furthermore, Mr. Johnson reports that the phones in the recreation area—which as a practical matter are the only available means of communicating with counsel—are only about four to five feet apart, meaning that he must either risk coming into close proximity to other inmates to make calls or forego such calls altogether.[7]

Due to the deteriorating conditions at the Correctional Treatment Facility and his underlying health conditions, Mr. Johnson, through counsel, submitted a letter (Exhibit B) to the Bureau of Prisons on April 15, 2020, requesting that the Bureau file a motion on his behalf seeking his compassionate release to home confinement. Later the same day, Associate General Counsel Zachary Kelton responded that the Bureau "will not be able to consider [Mr. Johnson] . . . for

---

*But see Banks* Inspector Report at 21 (indicating that "as a general matter, there has been no access to confidential legal calls for inmates confined on quarantine and non-quarantine housing units").

Regardless, given news reports regarding the risks presented by in-person visits, *see* Radley Balko, *A D.C. Public Defender Describes Terrible Conditions at the City's Jail*, Wash. Post (Apr. 14, 2020), https://www.washingtonpost.com/opinions/2020/04/14/dc-public-defender-describes-terrible-conditions-citys-jail, and "stay-at-home" orders issued by area governments, counsel respectfully submits that in-person visits are not a viable means of communication at present. The factual assertions included in this motion are based on information conveyed by Mr. Johnson during outgoing calls he made to counsel.

[7] Mr. Johnson reports that he was taking classes online through Ashland University, but the tablet he had been using to participate in these classes has not been available to him for several weeks, apparently due to COVID-19-related restrictions. Mr. Johnson would seek to resume these classes if resentenced to home confinement.

compassionate release" because he is "not currently in BOP custody," and thus the Bureau "does not anticipate bringing a motion for such relief on his behalf." (Exhibit A.) In light of this denial, Mr. Johnson has fully exhausted his administrative remedies as required by 18 U.S.C. § 3582(c)(1)(A). *See* Bureau of Prisons Program Statement 5050.50, § 571.63 (Jan. 17, 2019) (denial of an inmate's § 3582(c) request by the Bureau's General Counsel "constitutes a final administrative decision" for purposes of exhaustion under the statute). Accordingly, there are no procedural obstacles to this Court's consideration of Mr. Johnson's motion for compassionate release, and, for the reasons given below, this Court should grant such relief.

## ARGUMENT

Section 603(b) of the FIRST STEP Act amends 18 U.S.C. § 3582(c)(1)(A) as a means of "increasing the use and transparency of compassionate release." Pub. L. No. 115-391, 132 Stat. 5194, 5239 (2018) (capitalization omitted); *see also United States v. Ebbers*, No. 02-cr-11443 (VEC), 2020 WL 91399, at *4 (S.D.N.Y. Jan. 8, 2020) ("[T]he history and text of the First Step Act suggest that Congress intended to broaden the availability of compassionate release."). This amendment for the first time allows inmates to move for compassionate release when the Bureau of Prisons declines to do so. As courts across the country have recognized, § 3582(c)(1)(A) provides a mechanism for protecting inmates who, like Mr. Johnson, are at elevated risk of developing severe illness from the coronavirus. *See United States v. Zukerman*, No. 16-cr-194 (AT), 2020 WL 1659880, at *5 (S.D.N.Y. Apr. 3, 2020) (collecting cases).

As relevant here, the statute allows courts to reduce a defendant's term of imprisonment and convert the reduced sentence to a term of "supervised release with . . . conditions" (e.g., home confinement), provided several conditions are satisfied. 18 U.S.C. § 3582(c)(1)(A). In particular, the court may grant such relief only (1) "after considering the factors set forth in [18 U.S.C. §]

3553(a) to the extent that they are applicable," if the court finds that (2) "extraordinary and compelling reasons warrant such a reduction" and (3) "such a reduction is consistent with the applicable policy statements issued by the Sentencing Commission." *Id.* Here, granting Mr. Johnson compassionate release to home confinement is appropriate under the § 3553(a) factors, supported by extraordinary and compelling safety reasons, and consistent with the Sentencing Commission's policy concerning inmate health.

## I. Compassionate Release to Home Confinement is Appropriate under § 3553(a)

To the extent the Court finds that the § 3553(a) factors are applicable, they weigh in favor of granting Mr. Johnson's motion for compassionate release to home confinement.

At sentencing, the Court focused on two factors in particular: the nature and circumstances of the offenses and the history and characteristics of the defendant. (ECF No. 195 at 44.) *See* 18 U.S.C. § 3553(a)(1). In addition, the Court cited the need for just punishment. (ECF No. 195 at 52.) *See* 18 U.S.C. § 3553(a)(2)(A). While these factors warranted a term of 41 months' imprisonment at the time of sentencing, they do not warrant a 41-month sentence served in conditions that expose Mr. Johnson to a highly contagious virus that can cause serious illness or death. *See Banks* Mem. Op. at 8–9 (crediting unrebutted expert declarations as showing "an increased risk for contracting COVID-19" in the D.C. Jail "caused by [its managers'] untimely and insufficient precautions"); *see also, e.g.*, *Zukerman*, 2020 WL 1659880, at *6 ("The severity of [the defendant's] conduct remains unchanged. What has changed, however, is the environment where [he] is serving his sentence."); *United States v. Rodriguez*, No. 2:03-cr-271 (ABB), 2020 WL 1627331, at *12 (E.D. Pa. Apr. 1, 2020) (granting motion for compassionate release and concluding that defendant's original sentence "did not include incurring a great and unforeseen risk of severe illness or death"); *cf. also, e.g.*, *United States v. Davis*, No. ELH-20-09, 2020 WL 1529158, at *4, 8 (D. Md. Mar. 30, 2020) (granting defendant pretrial release under the Bail

Reform Act in part due to deteriorating conditions at the D.C. Correctional Treatment Facility, where defendant was being held).

Compassionate release is especially warranted here in light of the remaining § 3553(a) factors. Mr. Johnson was on pretrial bail for three and a half years while his case was pending in this Court, suggesting that incarceration is not necessary "to protect the public from further crimes of the defendant."[8] 18 U.S.C. § 3553(a)(2)(C); *see also* PSR ¶ 14 (ECF No. 172 at 6) (stating that Mr. Johnson "complied with all Court ordered conditions of release" while on bail except for failing to report to pretrial services on several occasions). Because Mr. Johnson has already served a meaningful amount of prison time, compassionate release under the extraordinary circumstances presented here would not undermine the interests of affording adequate deterrence. *See id.* § 3553(a)(2)(B). As for the "need . . . to provide the defendant with needed . . . medical care . . . in the most effective manner," continued incarceration in the Correctional Treatment Facility would, if anything, *create* a need for medical care and interfere with the treatment of Mr. Johnson's preexisting medical conditions. *Id.* § 3553(a)(2)(D); *see also, e.g.*, *Rodriguez*, 2020 WL 1627331, at *12 (noting that incarceration could "interfere with [defendant's] ability to get needed medical care"); *cf. Banks* Mem. Op. at 13 ("[A]s of April 4, 2020, the infection rate in DOC facilities was over seven times the infection rate of the District of Columbia at large" and those infected in Correctional Treatment Facility "are at significantly higher risk of harm if they do become infected" (quoting Dec. of Jamie Meyer, *Banks* ECF No. 5-2, ¶ 33)). Mr. Johnson is a military veteran and, if subject to home confinement, would be eligible for needed medical treatment

---

[8] Regarding the risk of harm to the community generally, Mr. Johnson would, if confined to his mother's residence as proposed (see attached proposed Order), also remain in self-isolation for 14 days to protect himself and his mother from exposure to COVID-19. *See, e.g., Zukerman*, 2020 WL 1659880, at *6 (granting motion for compassionate release to home confinement and ordering that defendant "shall remain self-quarantined for 14 days after release").

through the Department of Veterans Affairs.  And while counsel is unaware of other "defendants with similar records who have been found guilty of similar conduct," compassionately releasing Mr. Johnson to home confinement in these unusual circumstances would presumably not result in "unwarranted sentence disparities."  *Id.* § 3553(a)(6).

Last, in considering the "kinds of sentences available," *id.* § 3553(a)(3), since the time of Mr. Johnson's sentencing, the public health benefits of home confinement have increased dramatically while the health risks to inmates have worsened in equal measure.  *See Banks* Mem. Op. at 25 ("[L]essen[ing] the risk that [those in the D.C. Jail] will contract COVID-19 is in the public interest because it supports the public health.  No man's health is an island."); *see also generally Update on COVID-19 and Home Confinement*, Federal Bureau of Prisons (last updated Apr. 5, 2020), https://www.bop.gov/resources/news/20200405_covid19_home_confinement.jsp.  Notably, given the available alternative of home confinement, Mr. Johnson does not seek an unconditional reduction in his sentence; rather, he seeks a different *kind* of sentence to mitigate the risk of contracting severe illness.  *See, e.g.*, *United States v. Powell*, No. 1:94-cr-316 (ESH), 2020 WL 1698194, at *1 (D.D.C. Mar. 28, 2020) (converting remainder of incarceratory sentence to home confinement under § 3582(c)(1)(A) due to increased coronavirus risk); *United States v. Campagna*, No. 16-cr-78-01 (LGS), 2020 WL 1489829, at *3 (S.D.N.Y. Mar. 27, 2020) (same); *Zukerman*, 2020 WL 1659880, at *6 (same).  In light of this serious and unforeseen coronavirus risk, such an alternative sentence is appropriate under § 3553(a).

**II.    Extraordinary and Compelling Reasons Warrant Release to Home Confinement**

While the COVID-19 pandemic's impact on jails and prisons nationwide—and on the D.C. Correctional Treatment Facility in particular—is itself extraordinary and compelling, Mr. Johnson's risk factors are unusually so.  These factors set Mr. Johnson apart from the general

–11–

federal inmate population, and constitute "extraordinary and compelling reasons" for compassionate release pursuant to § 3582(c)(1)(A). *See Zukerman*, 2020 WL 1659880, at *6 (collecting cases finding "extraordinary and compelling reasons" based on an inmate's heightened risk factors).

As outlined above, Mr. Johnson suffers from medical conditions, including obesity and high blood pressure, which make the prospect of his contracting the coronavirus especially dangerous. Medical professionals have emphasized that people with such conditions should exercise proper social distancing and hand-washing practices. *See, e.g.*, Am. Heart Ass'n Rec., *supra* ("If you have high blood pressure or another underlying condition, it's especially important to follow recommendations about social distancing, hand-washing and other practices that can prevent COVID-19's spread."). Yet, as a court-ordered inspection of the Correctional Treatment Facility recently confirmed, Mr. Johnson cannot meaningfully avail himself of such preventative measures. *See, e.g.*, *Banks* Inspector Report at 18, 20 (correctional officers at the Correctional Treatment Facility are "fail[ing] to enforce social distancing requirements" and inmate masks are "ill-fitting, visibly soiled, and ripped"). Furthermore, due to his PTSD, Mr. Johnson will have an unusually difficult experience coping with the stress of being at the center of a COVID-19 outbreak in prison, not to mention the stress of experiencing the symptoms of the virus if he contracts it. *See* Yao & Chen, *Patients with Mental Health Disorders*, *supra*.

In short, even as compared to the vulnerable D.C. prison population, Mr. Johnson's physical and mental health conditions present an "extraordinary and compelling" basis for § 3582 relief. Granting such relief here would not undermine the narrow and focused role § 3582(c) was designed to play, nor set a precedent for indiscriminate releases of inmates from custody.

### III.  Sentencing Commission Policy Supports Release to Home Confinement

With respect to the final part of the § 3582 inquiry, granting Mr. Johnson compassionate release on the basis of his health risks would be "consistent with the applicable policy statements issued by the Sentencing Commission."  18 U.S.C. § 3582(c)(1)(A).

"[T]he Sentencing Commission's policy statement at U.S.S.G. § 1B1.13 . . . applies to motions for reductions of a term of imprisonment under § 3582(c)(1)(A)."[9]  *Goldberg*, 2020 WL 1853298, at *3.  While § 1B1.13 generally mirrors the statutory language of § 3582(c)(1)(A), as relevant here, the commentary also sets forth a list of four "circumstances" that meet the "extraordinary and compelling" standard for compassionate release.  U.S.S.G. § 1B1.13 cmt. 1; *see also Goldberg*, 2020 WL 1853298, at *3.  One such circumstance is where a "defendant is . . . suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover."  U.S.S.G. § 1B1.13 cmt. 1(A)(ii).  Courts in recent weeks have held that, particularly in light of this commentary, granting compassionate release to inmates who suffer from COVID-19 risk-enhancing conditions is consistent with the Commission's § 1B1.13 policy statement.  *See, e.g.*, *Zukerman*, 2020 WL 1659880, at *5 (defendant's conditions included hypertension and obesity); *Rodriguez*, 2020 WL 1627331, at *7

---

[9] Because U.S.S.G. § 1B1.13 was last substantively amended by the Sentencing Commission in 2016, before the most recent version of 18 U.S.C. § 3582 was enacted as part of the FIRST STEP Act of 2018, the Commission's policy statement anachronistically references only a "motion of the Director of the [Bureau of Prisons]."  U.S.S.G. § 1B1.13.  As a result, courts have split on whether § 1B1.13 "may be eschewed as outdated" or instead must be considered except insofar as it requires a motion filed by the Bureau.  *United States v. Goldberg*, No. 12-cr-180 (BAH), 2020 WL 1853298, at *3 (D.D.C. Apr. 13, 2020) (collecting cases and holding that § 1B1.13 continues to apply).  The Court need not resolve this issue and may assume that § 1B1.13 applies, because, as explained below, compassionately releasing Mr. Johnson to home confinement is consistent with § 1B1.13.

(same); *United States v. Muniz*, No. 4:09-cr-199-1 (KPE), 2020 WL 1540325, at *1–2 (S.D. Tex. Mar. 30, 2020) (defendant's conditions included arterial hypertension).

Here, as in the cases cited above, Mr. Johnson suffers from multiple medical conditions—high blood pressure (i.e., hypertension), obesity, and PTSD—that increase his risk of developing severe coronavirus symptoms, thus impeding his ability "to provide self-care" while in prison. U.S.S.G. § 1B1.13 cmt. 1. Rather than wait for such symptoms to manifest, this Court should find that extraordinary and compelling reasons consistent with the Sentencing Commission's policy statement warrant compassionately releasing Mr. Johnson to the safety of home confinement.

## CONCLUSION

For the reasons given above, Mr. Johnson respectfully requests that this Court grant him compassionate release to home confinement as set forth in the attached proposed Order, or such other relief as authorized by § 3582 and deemed appropriate by the Court.

Respectfully submitted,

/s/ *Kevin King*
Kevin King (D.C. Bar No. 1012403)
Virginia Williamson[*]
COVINGTON & BURLING LLP
850 Tenth St. NW
Washington, DC  20001-4956
(202) 662-6000
kking@cov.com

*Court-Appointed Appellate (CJA)*
*Counsel for Morris Gemal Johnson*

April 21, 2020

---

[*] Ms. Williamson is a member of the Bar of Maryland and the Bar of the United States District Court for the District of Columbia (ID #D00525). Her District of Columbia Bar application is pending, and she is practicing under the supervision of principals of Covington & Burling LLP, including Kevin King, court-appointed appellate counsel for Mr. Johnson.

–14–

## CERTIFICATE OF SERVICE

I hereby certify that, on April 21, 2020, I caused the foregoing motion to be filed with the Clerk of the Court of the United States District Court for the District of Columbia using the Court's CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

April 21, 2020

/s/ *Kevin King*
Kevin King (D.C. Bar No. 1012403)
COVINGTON & BURLING LLP
850 Tenth St. NW
Washington, DC  20001-4956
(202) 662-6000
kking@cov.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.                                                                )<br>)    No. 15-cr-125 (KBJ)<br>MORRIS GEMAL JOHNSON,           )<br>)<br>*Defendant*.                                     )<br>) | |

**[PROPOSED] ORDER GRANTING MOTION
FOR COMPASSIONATE RELEASE PURSUANT TO 18 U.S.C. § 3582**

Upon consideration of the Motion for Compassionate Release Pursuant to 18 U.S.C. § 3582 filed by Defendant Morris Gemal Johnson, and any response thereto, it is hereby

**ORDERED** that the motion is **GRANTED**; and it is further

**ORDERED** that Defendant's previously imposed sentence of imprisonment of forty-one months is reduced to time-served.  It is further

**ORDERED** that, subject to the conditions stated below, Defendant be immediately released from custody on his sentence in this case.  It is further

**ORDERED** that Defendant abide by the standard supervised release conditions.  It is further **ORDERED** that Defendant abide by the following additional supervised release conditions:

1) Within 72 hours of release, Defendant shall contact the U.S. Probation Office at 202-565-1300 for specific reporting instructions.

2) Defendant shall reside at the residence of his mother, Concha Johnson, in Washington, DC.

3) Until March 13, 2022, Defendant shall be restricted to his residence at all times except for employment; education; religious services; medical, substance abuse, or mental health treatment; attorney visits; court appearances; court-ordered obligations; or other activities as pre-approved by his Probation Officer.

4) After March 13, 2022, Defendant shall begin serving his previously-imposed term of sixty months' supervised release in accordance with the conditions set forth at the sentencing held on November 19, 2019, and as stated in the December 10, 2019 judgment form (ECF No. 183).

**IT IS SO ORDERED.**

_____
Hon. Ketanji Brown Jackson
United States District Judge

Dated: _____, 2020


–18–

## **CERTIFICATE OF SERVICE**

Pursuant to Local Criminal Rule 47, the following individuals are entitled to receive notice of this Order:

John Philip Dominguez
U.S. ATTORNEY'S OFFICE FOR THE DISTRICT OF COLUMBIA
555 Fourth Street, NW
Washington, DC 20530
(202) 252-7684
Email: john.dominguez@usdoj.gov

Steven B. Wasserman
U.S. ATTORNEY'S OFFICE FOR THE DISTRICT OF COLUMBIA
555 Fourth Street, NW
Washington, DC 20530
(202) 252-7719
Email: steve.wasserman@usdoj.gov

*Counsel for United States of America*

Kevin King
Virginia Williamson
COVINGTON & BURLING LLP
850 Tenth Street NW
Washington, DC 20001
(202) 662-5488
kking@cov.com
vwilliamson@cov.com

*Court-Appointed Appellate Counsel
for Defendant Morris Johnson*