**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) |
| MORRIS GEMAL JOHNSON, *et al.* | ) |
| | ) |
| Defendants. | ) |

Criminal No. 15-cr-125 (KBJ)

## <u>MEMORANDUM OPINION</u>

With the First Step Act of 2018, Congress enacted "the most substantial change[]

in a generation to the tough-on-crime prison and sentencing laws that ballooned the

federal prison population and created a criminal justice system that many . . . view[ed]

as costly and unfair."  Nicholas Fandos, *Senate Passes Bipartisan Criminal Justice Bill*,

N.Y. Times (Dec. 18, 2018).[1]  One key aspect of the legislation expands the authority of

federal sentencing courts to revisit, and reduce, a previously imposed term of

imprisonment—a power that is generally referred to as "compassionate release."  *See*

First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194, 5239 (2018) ("Increasing

the Use and Transparency of Compassionate Release").  Pursuant to section

3582(c)(1)(A) of Title 18 of the United States Code as amended, the court can reduce a

sentenced defendant's term of imprisonment when *the defendant* requests this

modification (whereas, previously, a reduction was authorized solely "upon motion of

the Director of the Bureau of Prisons," Sentencing Reform Act of 1984, Pub. L. No. 98-

473, ch. 2, sec. 212, § 3582(c)(1)(A), 98 Stat. 1837, 1998 (1984)), but only if the court

---

[1] The cited source has been archived at the time of this writing and may be accessed at:
https://nyti.ms/2Lmtruj.

finds that "extraordinary and compelling reasons warrant such a reduction[,]" and if the reduction is consistent with both the court's reassessment of the purposes of punishment embodied in the statutory sentencing factors at 18 U.S.C. § 3553(a) and the Sentencing Commission's policy statements regarding the appropriate exercise of the court's compassionate-release authority.  *See* 18 U.S.C. § 3582(c)(1)(A).

The instant case fits squarely within the intended scope of the First Step Act's compassionate-release authorization.  Defendant Morris Gemal Johnson is an honorably discharged veteran with no prior criminal history who completed two tours in Afghanistan and has since been diagnosed with post-traumatic stress disorder and other mental and physical conditions.  Johnson was convicted of various weapons-related offenses under federal and state law in April of 2019, at the conclusion of a seven-day jury trial during which the prosecution ably demonstrated that Johnson had illegally possessed two 37-millimeter shell casings into which flechettes and other shrapnel had been inserted, and that Johnson had also engaged in multiple e-mail exchanges and online transactions with a notorious Swedish arms dealer, seemingly arranging for the unlawful shipment of machine gun parts and silencers into the United States.  *See United States v. Johnson*, No. 15-cr-125, 2019 WL 3842082, at *1 & n.1, *3 (D.D.C. Aug. 15, 2019).

Johnson's established conduct was undoubtedly unlawful, and, ultimately, this Court upheld the jury's guilty verdict with respect to the seven counts contained in the latest superseding indictment.  *Id.* at *5.  Significantly for present purposes, however, the Court had previously concluded that Johnson was not a flight risk or a danger to the community despite the inherently dangerous nature of the charged offenses, and it had therefore ordered his release during the pretrial period, over the government's

objection.  (*See* Minute Entry of Dec. 8, 2016.)  Moreover, and importantly, Johnson

maintained a generally good track record of compliance with his release conditions for

the nearly three-and-a-half-year period that it took to bring his case to trial.  Thus,

when the jury rendered its guilty verdict and Johnson was taken into custody on April

25, 2019, he was physically restrained for the first time since his arrest in 2015, to

begin serving the 41-month prison sentence that this Court subsequently imposed based

upon the applicable Sentencing Guidelines and the Court's evaluation of the sentencing

factors that Congress has set forth in 18 U.S.C. § 3553(a).

Approximately 12 months later, on April 21, 2020, Johnson filed a motion for

emergency release, requesting a reduction of his term of imprisonment under 18 U.S.C.

§ 3582(c)(1)(A)(i) due to "his underlying health conditions" and "the deteriorating

conditions" inside the prison with respect to the spread of COVID-19.  (Def.'s Mot. for

Compassionate Release ("Def.'s Mot."), ECF No. 209 at 1.)  This Court first addressed

Johnson's motion for compassionate release at the end of a hearing that the Court held

on April 27, 2020, at which time the Court issued an oral indicative ruling.  (*See* Minute

Entry of Apr. 27, 2020.)  As later reflected in the Court's Order of April 29, 2020, the

Court concluded that a reduction of Johnson's term of imprisonment pursuant to 18

U.S.C. § 3582(c)(1)(A)(i) was warranted and, as a result, the Court **GRANTED**

Johnson's motion for compassionate release.  (*See* Order Granting Def.'s Mot., ECF

No. 219.)

The instant Memorandum Opinion lays out this Court's understanding of the

sentence-reduction authority that section 3582(c)(1)(A) confers, as well as the

substantive requirements of that statute with respect to the evaluation of motions for

compassionate release.  It also explains why the Court concluded that Johnson's motion

satisfies those standards.  In short, this Court is of the view that, as a threshold matter, it has jurisdiction to entertain a motion for a sentence reduction that a defendant files pursuant to section 3582(c)(1)(A) if the defendant either exhausts his administrative remedies or if exhaustion would be futile, and that the Bureau of Prisons's ("BOP's") assertion that Johnson's request for compassionate release was not eligible for agency consideration because Johnson was not yet in BOP custody plainly satisfies the compassionate release statute's exhaustion-related, claim-processing prescriptions. Moreover, with respect to the merits of any such motion, section 3582(c)(1)(A) appears to require courts undertake a two-step analysis of a defendant's compassionate release request.  The court must, first, find that "extraordinary and compelling reasons warrant such a reduction" of the previously imposed prison sentence, as that term has been defined in the Sentencing Commission's policy statements.  And if those reasons exist, the court must then proceed to evaluate whether the otherwise warranted reduction in the defendant's term of imprisonment should nevertheless be denied, either due to the required revisiting of the factors that led to the court's prior determination that the original prison term was necessary to comply with the purposes of punishment under section 3553(a), or because the warranted reduction of the defendant's term of imprisonment is inconsistent with the policy concerns expressed by the Sentencing Commission.

Applying these standards to the circumstances presented here, this Court has concluded that the prevalence of a novel and potentially deadly strain of coronavirus in the facility where Johnson has been housed, coupled with the established fact that Johnson has certain preexisting medical conditions that put him at a higher risk of being harmed if he contracts COVID-19, qualifies as an extraordinary and compelling reason

that a reduction of his 41-month term of imprisonment is warranted.  And the Court has further determined that the none of the considerations concerning the purposes of punishment in section 3553(a)—including the significant and substantial interest in protecting public safety that is reflected in the Sentencing Commission's compassionate release-related policy statement—requires maintenance of the original prison term, especially given the risks posed by the conditions of incarceration that presently exist in D.C. Department of Corrections facilities.

## I.  LEGAL AND FACTUAL BACKGROUND

### A.  Motions For Compassionate Release Under 18 U.S.C. § 3582(c)(1)(A)

#### 1.  The Court's Jurisdiction To Entertain A Defendant's Motion For Compassionate Release

"Federal courts are forbidden, as a general matter, to modify a term of imprisonment once it has been imposed, but th[at] rule of finality is subject to a few narrow exceptions."  *Freeman v. United States*, 564 U.S. 522, 526 (2011) (internal quotation marks and citation omitted); *see also* 18 U.S.C. § 3582(c).  Section 3582(c)(1) of Title 18 of the United States Code codifies one such exception: as originally enacted, it empowers the Director of BOP to "petition the court for a reduction in . . . sentence[,]" S. Rep. No. 98-223 at 118 (1983), and provides a court with the authority to grant the Director's petition and thereby modify a previously imposed term of imprisonment, if the court finds "that the reduction [is] justified by 'extraordinary and compelling reasons[,]'" *id*.  As such, section 3582(c)(1)(A) is, at its core, jurisdictional in nature, insofar as Congress has provided sentencing judges with limited authority to reduce a previously imposed term of imprisonment, when, absent such statutory authorization, courts would have not have that power.

As mentioned above, the First Step Act of 2018 expanded the circumstances under which courts have sentence-reduction authority after a sentence has already been imposed, insofar as it permits the court to reduce a previously imposed term of imprisonment if the defendant files a motion for release directly with the court, separate and apart from the aforementioned petition that may be filed by the BOP Director. Notably, however, under the plain terms of the amended statute, the court may entertain such a defense motion only "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" 18 U.S.C. § 3582(c)(1)(A). And whether or not this exhaustion requirement is itself jurisdictional or is merely a non-jurisdictional, claim-processing mandate is presently subject to debate. *Compare United States v. Russo*, No. 16-cr-0441, 2020 WL 1862294, at *2–7 (S.D.N.Y. Apr. 14, 2020) *with United States v. Ogarro*, No. 18-cr-373, 2020 WL 1876300, at *2 (S.D.N.Y. Apr. 14, 2020). This matters because non-jurisdictional statutory exhaustion requirements can be excused or forfeited—*e.g.*, for good cause, the court can proceed even if the exhaustion requirements are not satisfied—whereas jurisdictional statutory exhaustion requirements are binding. *See Fort Bend County v. Davis*, 139 S. Ct. 1843, 1849 (2019); *Avocados Plus Inc. v. Veneman,* 370 F.3d 1243, 1247 (D.C. Cir. 2004).

In the District of Columbia, every court that has considered the jurisdictional or non-jurisdictional nature of the mandate that, prior to coming to court, a defendant either exhaust administrative processes, on the one hand, or request relief from the BOP and wait 30 days, on the other, has consistently concluded that section 3582(c)(1)(A)'s exhaustion requirement is *not* jurisdictional and is thus subject to equitable waiver by

the court.[2]  And this Court, too, reaches that same conclusion.  Under established D.C. Circuit precedent, in order for the exhaustion requirement to be deemed jurisdictional, Congress has to state "in clear, unequivocal terms that the judiciary is barred from hearing an action until the administrative agency has come to a decision," *Avocados Plus,* 370 F.3d at 1248 (internal quotation marks and citation omitted); otherwise, "courts [must] treat the [exhaustion] restriction as nonjurisdictional in character[,]" *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153 (2013) (internal quotation marks, alteration, and citation omitted).  No such unequivocal language appears in section 3582(c)(1)(A).

Furthermore, the non-jurisdictional character of section 3582(c)(1)(A) is especially evident when what Congress *does* say in that provision is carefully considered in the context in which it appears, given the purposes that Congress intended to achieve.  That is, "[g]enerally, Congress imposes exhaustion requirements in order to serve the twin purposes of protecting administrative agency authority and promoting judicial efficiency[,]" but "the hybrid requirement in this statute—either exhaust or wait 30 days—substantially reduces the importance of the first purpose, as it allows a defendant to come to court before the agency has rendered a final decision." *United States v. Haney*, No. 19-cr-541, 2020 WL 1821988, at *3 (S.D.N.Y. Apr. 13, 2020)

---

[2] *See, e.g.*, *United States v. Malone*, No. 13-cr-231, 2020 WL 1984261, at *1 (D.D.C. Apr. 27, 2020) (denying a motion for compassionate release after declining to "dismiss for lack of jurisdiction or on the ground that the requirement is not waivable"); *United States v. Jennings*, No. 18-cr-17, ECF No. 30 at 3 (D.D.C. Apr. 22, 2020) (concluding that the compassionate release exhaustion requirement is non-jurisdictional, and finding that waiver was appropriate "given the history of the compassionate release statute and the urgency of the COVID-19 pandemic"); *United States v. Ghorbani*, No. 18-cr-255, ECF No. 131 (D.D.C. April 3, 2020) (agreeing with the parties' joint filing that a court can dispense with the administrative exhaustion requirement under section 3582(c)(1)(A) where there are exceptional circumstances of peculiar urgency or exhaustion would be futile); *United States v. Powell*, No. 94-cr-316, 2020 WL 1698194, at *1 (D.D.C. Mar. 28, 2020) (waiving the requirement because "requiring defendant to first seek relief through the Bureau of Prisons' administrative process would be futile").

(internal quotation marks, citation, and alternation omitted).  Thus, it appears that

Congress did not intend for this exhaustion requirement to bar judicial review in the

absence of agency input and, as such, the requirement is reasonably construed as claim-

processing rule that is subject to waiver by the court or forfeiture by the government.

*See United States v. Scparta*, No. 18-cr-578, 2020 WL 1910481, at *4 (S.D.N.Y. Apr.

20, 2020).  Accordingly, consistent with the generally accepted standards that courts

have applied in similar circumstances, a court can excuse section 3582(c)(1)(A)'s

exhaustion requirement where, among other things, "the agency will almost certainly

deny any relief either because it has a preconceived position on, or lacks jurisdiction

over, the matter."  *Randolph-Sheppard Vendors of Am. v. Weinberger*, 795 F. 2d 90,

107 (D.C. Cir. 1986); *see also Paese v. Hartford Life & Acc. Ins. Co*., 449 F.3d 435,

443 (2d Cir. 2006) (stating that a "claim-processing rule" is "subject to equitable

considerations such as waiver, estoppel[,] or futility").

> 2.   Substantive Standards For Review Of Compassionate Release
>       Motions

In addition to establishing the court's authority to entertain a defense motion for

compassionate release, the amended section 3582(c)(1)(A) also prescribes specific

circumstances under which such a motion may be granted.  As relevant here, pursuant

to that statutory provision, the court "may reduce [a previously imposed] term of

imprisonment, after considering the factors set forth in section 3553(a) to the extent

they are applicable, if it finds that extraordinary and compelling reasons warrant such a

reduction . . . and that such a reduction is consistent with applicable policy statements

issued by the Sentencing Commission[.]"  18 U.S.C. § 3582(c)(1)(A); *see also* 28

U.S.C. § 994(t) (tasking the Sentencing Commission with "describ[ing] what should be

considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples").

For its part, at section 1B1.13 of the Guidelines Manual, the Sentencing Commission has promulgated a policy statement that specifically addresses motions for compassionate release brought under 18 U.S.C. § 3582(c).  In particular, section 1B1.13 identifies various scenarios in which "extraordinary and compelling reasons warrant the reduction" of a term of imprisonment, U.S.S.G. § 1B1.13(1)(A), including where the defendant is either "suffering from a serious physical or medical condition" or "from a serious functional or cognitive impairment . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover[,]" *id.* cmt. n.1(A)(ii).  Section 1B1.13 also indicates that, before any reduction of a term of imprisonment under 18 U.S.C. § 3582(c), the court should "determine[]" that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."[3]

---

[3] Given that Congress specifically directed the Sentencing Commission merely "to describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples," 28 U.S.C. § 994(t), the Commission's authority to require a separate assessment of defendant's dangerousness where a compassionate release motion otherwise establishes extraordinary and compelling reasons within the meaning of policy statement's application notes is not entirely clear.  Moreover, given the specific reference to a dangerousness factor in the second statutory category of compassionate release authority, *see* 18 U.S.C. § 3582(c)(1)(A)(ii) (pertaining to defendants who are at least 70 years old and have served at least 30 years in prison), it appears that Congress intentionally decided *not* to require a specific dangerousness finding for motions that, like Johnson's, invoke extraordinary and compelling reasons for a sentence reduction, *see id.* § 3582(c)(1)(A)(i).  *Cf. Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (internal quotation marks omitted)).  Nevertheless, to the extent that Congress also mandates that a court consider the section 3553(a) factors prior to granting a motion for compassionate release, the potential danger that a defendant's release would pose to the community is addressed by the court's evaluation of "the need for the sentence imposed . . . to protect the public from further crimes of the defendant[,]" 18 U.S.C. § 3553(a)(2)(C), such that, by analyzing this particular sentencing factor

When all of Congress's directives and the Sentencing Commission's prescriptions are taken into account, it appears that section 3582(c)(1)(A)(i) requires a court that is presented with a defendant's motion for compassionate release to make two essential determinations.  First, the court must decide whether or not "extraordinary and compelling reasons" to reduce the defendant's term of imprisonment exist, and that determination must be made "consistent with" what the Sentencing Commission has said about the types of circumstances that meet that statutory requirement.  18 U.S.C. § 3582(c)(1)(A).  If such reasons exist, then a reduction of the defendant's term of imprisonment is "warrant[ed]" per the language of section 3582(c)(1)(A)(i).  But whether or not a justified motion for compassionate release will be *granted* appears to turn on Congress's requirement that the court reassess the applicable section 3553(a) factors, presumably with an eye toward whether it is necessary to maintain the prior term of imprisonment despite the extraordinary and compelling reasons to modify the defendant's sentence in order to achieve the purposes of punishment that compelled the court to impose the original term of imprisonment.

In other words, because the sentencing court initially considered the section 3553(a) factors to satisfy Congress's mandate that it impose a sentence that is "sufficient but not greater than necessary to comply with the purposes [of punishment]," 18 U.S.C. § 3553(a), and yet section 3582(c)(1)(A) requires a reconsideration of that same set of factors when deciding whether or not to modify the original sentence when there are extraordinary and compelling reasons to do so, Congress's compassionate release standards appear to require the court to evaluate,

_____

pursuant to Congress's directive, a court is necessarily assessing a compassionate release motion consistent with the dangerousness concerns expressed in the Commission's policy statement.

first, whether the requested modification is warranted—*i.e.*, whether there are extraordinary and compelling reasons for the reduction, as defined by the Sentencing Commission's policy statements—and, if so, whether the purposes of punishment that the court previously assessed (including public safety) would be impacted by the requested reduction—*i.e.*, whether, despite the fact that a sentence reduction is warranted, section 3553(a)'s purposes of punishment require maintenance of the original prison term.  *See, e.g., United States v. Wade*, No. 2:99-cr-00257-3, 2020 WL 1864906, at *6–7 (C.D. Cal. Apr. 13, 2020) ("A sentence reduction, even if justified by the existence of extraordinary and compelling reasons, may only be granted if it would be consistent with the factors set forth in 18 U.S.C. § 3553, to the extent they apply . . . [and] [r]equiring Wade to serve the 50-plus years outstanding on her original sentence would not . . . accomplish any of the objectives identified by Congress in § 3553.").

B.       **The Underlying Facts Of The Instant Case**

On September 30, 2015, defendant Morris Gemal Johnson was indicted for possession of a single "37mm shell modified as an improvised explosive device" in violation of 26 U.S.C. § 5861(d).  (Indictment, ECF No. 1 at 2.)  Law enforcement discovered the device buried in a box inside Johnson's home after executing a search warrant as part of a larger investigation into the activities of Raimo Huolman, a notorious Swedish arms dealer.  (*See* Trial Tr. at 201–11, Apr. 16, 2019, ECF No. 150.) The prosecution superseded the original indictment on May 5, 2016, adding one count of "possession of a weapon of mass destruction" in violation of 22 D.C. Code § 3154(a) with respect to that same 37-millimeter modified shell; it also charged both Johnson and Huolman with two counts of conspiracy to import various firearm parts in violation of federal law, based on e-mail exchanges that federal authorities discovered after

searching a hard drive that had been extracted from Huolman's residence in Sweden. (*See* Superseding Indictment, ECF No. 14; *see also* Trial Tr. at 19–22, Apr. 15, 2019, ECF No. 149.)

On January 1, 2018, the government brought additional charges related to another doctored 37-millimeter shell that a law enforcement laboratory expert discovered in September of 2017 at the bottom of one of the boxes that officers had removed from Johnson's home during the 2014 search.  (*See* Mot. for Explosives Expert To Submit Interim Voucher, ECF No. 62 at 1.)  This second superseding indictment contained a total of six federal and state charges relating to two counts of unlawful receipt or possession of an unregistered firearm (namely, the two 37-millimiter cartridges), in violation of 26 U.S.C. § 5861(d); two counts of unlawful making of such firearms, in violation of 26 U.S.C. § 5861(f); two counts of possession of a weapon of mass destruction (*i.e.*, the same two 37-millimeter cartridges), in violation of 22 D.C. Code § 3154(a); and one count of conspiracy to smuggle goods into the United States, in violation of 18 U.S.C. § 371.  (*See* Superseding Indictment, ECF No. 70.)

Significantly for present purposes, Johnson remained out of jail throughout the more than three-year period during which these charges were being incrementally meted out.  Specifically, although the prosecution sought to have him detained pretrial at a detention hearing held in December of 2016, the Court evaluated the section 3142(g) pretrial detention factors and determined that, on balance, they weighed in favor of release.  (*See* Minute Entry of Dec. 8, 2016.)  In particular, the Court found that Johnson's charged offenses were serious and the evidence against him strong, but the offense conduct did not involve violence, and Johnson had no prior convictions.  (*See* Hr'g Tr. at 10–12, Dec. 8, 2016.)  In addition, the Court noted that Johnson is an

honorably discharged Army veteran who has served two tours of duty in Afghanistan and has strong ties to the District of Columbia, including many supportive family members. (*Id.* at 12–13) Johnson has also been diagnosed with post-traumatic stress disorder ("PTSD") and had concomitant substance-abuse issues, so being on pretrial release conditions afforded him the opportunity to participate in a series of in-patient and out-patient treatment programs. (*Id.* at 13.) And throughout the lengthy pretrial release period, Johnson *did* successfully participate in and complete various treatment programs through the Veterans Administration, all while generally complying with the conditions of his release and assisting his counsel to prepare for trial. (*See, e.g.*, Hr'g Tr. at 6, Jan. 29, 2016; Order Amending Conditions of Release, ECF No. 20.)

At the end of a seven-day trial that took place between April 15 and April 25, 2019, the jury deliberated for less than two hours with respect to the testimony of sixteen witnesses and scores of exhibits—evidence that plainly demonstrated that "Johnson [had] made and possessed [the] two improvised explosive devices . . . and [had] conspired to smuggle machine guns, machine gun parts, and silencers into the United States." *Johnson*, 2019 WL 3842082, at *1. Johnson was convicted of seven counts charging him with various violations of federal and District of Columbia firearm laws on April 25, 2019, (*see* Verdict Form, ECF No. 143), and he was immediately taken into custody (*see* Minute Entry of Apr. 25, 2019).

Seven months later, in November of 2019, this Court sentenced Johnson to a 41-month term of imprisonment and a 60-month term of supervised release. (*See* Judgment, ECF No. 183.) During the sentencing hearing, the Court calculated the applicable guidelines range, and then evaluated the section 3553(a) sentencing factors.

(*See generally* Sentencing Hr'g Tr., Nov. 19, 2019, ECF No. 189.)[4]  With respect to the

section 3553(a) considerations, the Court took into account that Johnson had

"committed very serious and very dangerous crimes" and that the evidence against him

was "overwhelming[]" (*id.* at 45:21-23), but the Court also considered that Johnson had

no criminal history, enjoyed the support of many friends and family, struggled

"mentally and emotionally" following his active duty, and had been diagnosed with

PTSD (*id.* at 48–49, 50:2-6).  Ultimately, the Court determined that a sentence of 41

months of imprisonment, which was at the bottom of the applicable Sentencing

Guidelines range, followed by a substantial period of supervised release, was sufficient

but not greater than necessary to serve the purposes of just punishment and deterrence,

to protect the public, and to reflect the inherent dangerousness of Johnson's crimes.

(*Id.* at 53.)

### C.    The Procedural History Of Johnson's Compassionate Release Motion

Johnson was committed to the custody of the Attorney General on April 25,

2019, and has been housed at the D.C. Correctional Treatment Facility ("CTF"), which

is run by the D.C. Department of Corrections ("D.C. DOC"), since that date.  Notably,

although Johnson is a federal detainee, he was detained at CTF for more than 12

---

[4] To calculate the federal sentencing guideline range, the Court considered sections 2K2.1 and 2X1.1 of the Guidelines Manual, and determined that all of Johnson's crimes of conviction, which were divided into two groups, carried an offense level of 18.  (*See* Sentencing Hr'g Tr. at 7.)  Because Count Group 2 involved at least 10 firearms, a four-level enhancement under section 2K2.1(b)(1)(B) applied to that count (*see id.* at 10–11), and because Johnson was convicted of multiple counts, a two-level enhancement also applied to the greater of the offense levels—resulting in an adjusted offense level of 24.  The Court further concluded that "military service, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from a typical one covered by the guidelines[,]" and thus a two-level downward departure under section 5H1.11 was appropriate.  (*Id.* at 18:14-17.)  Accordingly, the adjusted base offense level after departures was 22, and given that Johnson's had no criminal history, the applicable guideline range was 41 to 51 months of imprisonment.  (*Id.* at 18.)

months—first, in anticipation of sentencing, and then, pending transfer a Bureau of

Prisons facility.  (*See* Gov't Opp'n at 2.)

Johnson filed a notice of appeal on December 3, 2019, asserting challenges to

both his conviction and sentence.  (*See* Notice of Appeal, ECF No. 181; Criminal

Docketing Statement, United States v. Johnson, No. 19-3094 (D.C. Cir. Feb. 21, 2020).)

Johnson also sent a letter to BOP, on April 15, 2020, formally requesting that the

agency file a compassionate release motion on his behalf, pursuant to section

3582(c)(1)(A).  (*See* Letter from Virginia Williamson to Zachary J. Kelton, Assoc. Gen.

Counsel, Fed. Bureau of Prisons (Apr. 15, 2020), Ex. B to Def.'s Mot., ECF No. 209-2.)

Johnson's letter noted that he "was housed in a unit with inmates who have tested

positive for COVID-19, and that he was "being held in quarantine due to his potential

exposure to the virus," and the letter further stated that "[t]he novel coronavirus,

coupled with Mr. Johnson's medical history and conditions at the D.C. jail, presents

circumstances warranting relief under section 3582(c)(1)(A)(i)."  (*Id.* at 3.)  On the

same day that Johnson's request was received, the General Counsel's Office of BOP

responded that the agency "will not be able to consider [Johnson] . . . for compassionate

release" because he is "not currently in BOP custody," and therefore BOP "does not

anticipate bringing a motion for such relief on his behalf."  (E-mail from Zachary J.

Kelton, Assoc. Gen. Counsel, Fed. Bureau of Prisons, to Virginia Williamson (Apr. 15,

2020), Ex. A to Def.'s Mot., ECF No. 209-1 at 2.)

Johnson filed the instant opposed motion for compassionate release with this

Court on April 21, 2020.  (*See* Def.'s Mot. at 1.)  The parties briefed the motion on an

expedited basis, and then also promptly filed a consent motion to obtain Johnson's

medical records from D.C. DOC (*see* Consent Motion for Order, ECF No. 211), which

this Court granted (*see* Order, ECF No. 212).[5]  The voluminous medical records that the

Court received (hereinafter "Medical Records"), demonstrate, among other things, that

Johnson has a documented history of high blood pressure and PTSD, for which he takes

almost a dozen medications each day, and that he is also just shy of the severe-obesity

threshold.  (*See* Medical Records at 21–22, 27, 82–83, 169.)

On April 27, 2020, this Court held a telephonic hearing with respect to Johnson's

compassionate release motion, during which the Court considered both parties'

arguments and ruled orally on Johnson's release request.  (*See* Minute Entry of Apr. 27,

2020.)[6]  During its oral ruling, the Court first explained that, due to Johnson's pending

appeal, the Court lacked jurisdiction to grant his motion to reduce the sentence and that,

before the Court could change its prior judgment, the D.C. Circuit would have to

remand the matter for that limited purpose, or Johnson would have to voluntarily

dismiss his appeal.  (*See* Mot. Hr'g Tr. at 45, Apr. 27, 2020, ECF No. 217.)[7]  However,

---

[5] Johnson's D.C. DOC medical records were provided to the parties and the Court via e-mail on April 22, 2020.  (*See* E-mail from Eric Glover, Gen. Counsel, D.C. Dep't of Corrections, to Chambers of Judge Ketanji Brown Jackson (Apr. 22, 2020).)

[6] The hearing on Johnson's motion for compassionate release was held telephonically due to the physical closure of the Court's building in light of COVID-19.  *See* Standing Order In re: Use of Video Teleconferencing and Teleconferencing for Certain Criminal and Juvenile Delinquency Proceedings, No. 20-17 (D.D.C. Mar. 30, 2020), https://perma.cc/XHF3-KEG6.  During the motion hearing, defense counsel confirmed that "Mr. Johnson is waiving his presence" (Mot. Hr'g Tr. at 2:21-25, Apr. 27, 2020, ECF No. 217), and the Court found that it was "manifestly in the interest of justice[] to proceed expeditiously with respect to this motion and coordinating video conference capabilities [to] include[] Mr. Johnson would have resulted in additional delay" (*id.* at 3:10-13).

[7] It is clear beyond cavil that a "notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects involved in the appeal[.]" *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982).  A motion to modify a prison term pursuant to section 3582(c) is not one of the two established exceptions to the divestiture of a district court's jurisdiction over a matter pending appeal.  *See* Fed. R. App. P. 4(b)(5) (stating that "[t]he filing of a notice of appeal under this Rule 4(b) does not divest a district court of jurisdiction to correct a sentence under Federal Rule of Criminal Procedure 35(a)"); *see also United States v. Howard*, 267 F. Supp. 2d 1, 2–3 (D.D.C. 2003) (explaining that, in the D.C. Circuit, the district court retains "jurisdiction to reconsider its prior denial of defendant's request for a new trial so long as it is based on a claim of newly discovered evidence" (citing *Smith v. Pollin*, 194 F.2d 349, 350 (D.C. Cir. 1952))).  Thus, courts have consistently held that district courts lack authority to grant

16

pursuant to its authority under Federal Rule of Criminal Procedure 37(a), the Court proceeded to issue an indicative ruling, *see* Fed. R. Crim. P. 37(a)(3) ("If a timely motion is made for relief that the court lacks authority to grant because of an appeal that has been docketed and is pending, the court may . . . state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue"), and, after outlining its reasoning, the Court indicated that it would be inclined to grant Johnson's motion for compassionate release if it were to regain jurisdiction over the case (*see* Mot. Hr'g Tr. at 29).

Following this Court's indicative ruling, defense counsel "promptly notif[ied] the circuit clerk" of this Court's ruling in accordance with the Federal Rules of Appellate Procedure, *see* Fed. R. App. P. 12.1(a); *see also* Fed. R. Crim. P. 37(b), and the D.C. Circuit "remanded [the case] to the district court to enable it to enter an order granting defendant's motion for compassionate release, in accordance with the indicative ruling entered by the district court on April 27, 2020" (*see* Order, United States v. Johnson, No. 19-3094 (D.C. Cir. Apr. 29, 2020), ECF No. 218). (*See also* Notice, ECF No. 216.) Thus, this Court regained jurisdiction to modify Johnson's sentence on April 29, 2020, and on that same day it entered an Order and Amended Judgment, granting Johnson's motion for compassionate release, reducing his term of imprisonment to time served, and modifying his conditions of supervised release, for the reasons discussed below. (*See* Order Granting Def.'s Mot., ECF No. 219 (granting Johnson's motion "for the reasons stated during [the Court's] oral indicative ruling (and

---

motions for compassionate release pursuant to section 3582(c) while an appeal is pending. *See, e.g.*, *United States v. Maldonado-Rios*, 790 F.3d 62, 64 (1st Cir. 2015) (ruling concerning a motion pursuant to 18 U.S.C. § 3582(c)(2)); *United States v. Martin*, No. 18-cr-834-7, 2020 WL 1819961 (S.D.N.Y. Apr. 10, 2020) (motion pursuant to 18 U.S.C. § 3582(c)(1)).

as will be further clarified in a forthcoming Memorandum Opinion)"); *see also* Amended Judgment, ECF No. 220.)

## II.     ANALYSIS

This Court has ordered Johnson's release based on its conclusion that Johnson has satisfied his "burden of showing that he is entitled to a sentence reduction" under section 3582(c)(1)(A)(i).  *United States v. Gamble*, No. 3:18-cr-0022, 2020 WL 1955338, at *2 (D. Conn. Apr. 23, 2020) (internal citation omitted).  Specifically, and as explained fully below, the Court finds that it has jurisdiction to reduce Johnson's previously imposed term of imprisonment pursuant to section 3582(c)(1)(A); that the spread of COVID-19 inside D.C. DOC facilities and Johnson's heightened risk of serious complications are extraordinary and compelling reasons that warrant the requested sentence reduction; and that the applicable section 3553(a) sentencing factors, including the need to protect the public, do not compel Johnson's continued incarceration.

### A.     This Court Has Jurisdiction To Consider Johnson's Motion For Compassionate Release

The government's brief in opposition to Johnson's motion for compassionate release states that the government "assume[s], without conceding the issue, that for purposes of this motion the defendant has exhausted his administrative remedies." (Gov't Opp'n at 4 n.2; *see also* Hr'g Tr. at 4:19-20, Apr. 27, 2020, ECF No. 217 ("Just to make things move a little bit faster, I did want to just reiterate, I'm not challenging the issue of exhaustion.").)  This Court interprets this statement as an expression of the government's belief that section 3582(c)(1)(A)'s exhaustion requirement is not jurisdictional such that it is subject to forfeiture, and counsel is providing notice that

the government is opting to forfeit the exhaustion issue in this case, without conceding the question of whether Johnson has, in fact, exhausted his administrative remedies. But this does not avoid the issue, because the Court must address its own authority to accept the government's concession nevertheless. *See Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 366 F. Supp. 51, 55 (D.D.C. 1973) ("For the federal courts, jurisdiction is not automatic and cannot be presumed.")  In other words, notwithstanding the government's expressed intention not to raise exhaustion as an issue in this case, this Court must still determine whether or not it has jurisdiction to consider Johnson's compassionate motion for release, given what section 3582(c)(1)(A) says about exhaustion.

Under the plain terms of the statute, this Court has the authority to reduce Johnson's term of imprisonment either "upon motion of the Director of the Bureau of Prisons" or "upon motion of the defendant[.]"  18 U.S.C. 3582(c)(1)(A).  And now that the Court of Appeals has remanded the case to this Court for the purpose of entering its "indicative ruling" as an order, the sole jurisdictional issue is whether the Court has the power to entertain Johnson's motion for compassionate release in light of section 3582(c)(1)(A)'s exhaustion requirement—a power that, as explained in Section I.A above, can only be exercised "upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]"  18 U.S.C. § 3582(c)(1)(A).  The Court has already concluded that this exhaustion mandate is non-jurisdictional (*see* Section I.A), and Johnson's motion argues that the exhaustion

requirement's prescriptions are satisfied under the circumstances presented here (*see* Def.'s Mot. at 7–8).

This Court agrees.  First of all, there can be no doubt that Johnson's April 15, 2020, letter to the BOP seeking an agency-sponsored motion for compassionate release initiated the administrative process for the purpose of section 3582(c)(1)(A).  And when BOP's general counsel responded that BOP "will not be able to consider [Johnson] . . . for compassionate release" because he is "not currently in BOP custody" (E-mail from Zachary J. Kelton, Assoc. Gen. Counsel, Fed. Bureau of Prisons, to Virginia Williamson (Apr. 15, 2020), Ex. A to Def.'s Mot., ECF No. 209-1 at 2), Johnson unquestionably exhausted all of the administrative remedies that were available to him, as set forth in BOP's own regulations.  *See* 28 C.F.R. § 571.63(b) ("When an inmate's request for consideration under 18 U.S.C. [§] 3582(c)(1)(A) is denied by the General Counsel, . . . [t]his denial constitutes a final administrative decision.").  It is puzzling that, by refusing to concede exhaustion under the circumstances presented here, the government seeks to hold open the possibility of pressing an exhaustion of administrative remedies issue with respect to a defendant whose request for BOP assistance in the filing of a compassionate release motion is formally and finally rejected by the agency on the grounds that BOP's administrative processes do not apply to him.  But, in any event, it is clear to this Court that a detainee who has received such a letter of rejection from the agency has exhausted his administrative remedies within the meaning of section 3582(c)(1)(A), and thus he can invoke section 3582(c)(1)(A) and proceed to file his own motion for compassionate release.

For what it is worth, even if the government could credibly maintain that Johnson has failed to exhaust "all administrative rights to appeal [the] failure of the

Bureau of Prisons to bring a motion [for compassionate release] on [his] behalf[,]" 18

U.S.C. § 3582(c)(1)(A), Johnson's failure to exhaust any such administrative remedies

would be justifiable and entirely excused on futility grounds under the circumstances

presented in this case.  *See Randolph-Sheppard Vendors*, 795 F. 2d at 107 (allowing a

court to waive an exhaustion requirement where "the agency will almost certainly deny

any relief either because it has a preconceived position on, or lacks jurisdiction over,

the matter"); *United States v. Powell*, No. 1:94-cr-316, 2020 WL 1698194, at *1

(D.D.C. Mar. 28, 2020) (waiving the exhaustion requirement under section

3582(c)(1)(A) on futility grounds).  The government cannot have it both ways, and it

has already told Johnson that BOP cannot file a compassionate release motion on behalf

of defendants who, like Johnson, are detained at the D.C. DOC facilities awaiting

transport to a BOP facility.  (*See* Gov't Mot. for Additional Time to Respond to Def.'s

Mot., ECF No. 210, at 1–2.)  Thus, the government cannot also insist that Johnson be

made to wait for the agency to render a final decision on his futile request for such

assistance, or that he wait thirty days after filing his summarily rejected request to BOP

before filing his own motion with the Court.

> **B.     The Prevalence Of COVID-19 In D.C. DOC Facilities And Johnson's
> Preexisting Health Conditions, Taken Together, Provide
> Extraordinary And Compelling Reasons For Reducing Johnson's
> Prison Term**

Turning to the merits of Johnson's motion, it is clear beyond cavil that the

present global health crisis is like no other in modern times, and this Court "fully

acknowledges the unprecedented magnitude of the COVID-19 pandemic and the

extremely serious health risks that it presents for *all* of us, including, and perhaps

especially, those individuals who are unfortunately presently detained in federal

custody." *United States v. Wiggins*, No. 19-cr-258, 2020 WL 1868891, at *8 (D.D.C.

Apr. 10, 2020).  Indeed, "[w]ith no known effective treatment, and vaccines months (or

more) away, public health officials have been left to urge the public to practice 'social

distancing,' frequent (and thorough) hand washing, and avoidance of close contact with

others (in increasingly more restrictive terms)—all of which are extremely difficult to

implement in a detention facility." *United States v. Martin*, No. 19-cr-140-13, 2020

WL 1274857, at *2 (D. Md. Mar. 17, 2020).  It can be hardly disputed that the novel

strain of the coronavirus that causes COVID-19 is much more easily transmitted in the

prison environment, and as a result numerous courts around the country, including this

one, have ordered the temporary release of inmates held in pretrial or presentencing

custody in recent weeks.  *See, e.g.*, *United States v. Dabney*, No. 20-cr-27, 2020 WL

1867750, at *1 (D.D.C. Apr. 13, 2020) (ordering the release of a pretrial detainee with a

diagnosis of asthma); *United States v. McKenzie*, No. 18-cr-834, 2020 WL 1503669, at

*3 (S.D.N.Y. Mar. 30, 2020) (releasing a presentencing inmate with "a documented

respiratory condition").  In limited circumstances, courts have also authorized the

compassionate release of inmates serving federal sentences.  *See, e.g.*, *United States v.

McCarthy*, No. 3:17-cr-0230, 2020 WL 1698732, at *2 (D. Conn. Apr. 8, 2020)

(granting compassionate release to a detainee with various respiratory conditions); *see

also United States v. Curtis*, No. 03-cr-533, 2020 WL 1935543 (D.D.C. Apr. 22, 2020);

*United States v. Hammond*, No. 02-cr-294, 2020 WL 1891980 (D.D.C. Apr. 16, 2020).

The concerns about jail facilities' general inability to protect detainees appear to

be especially warranted at the correctional facilities here in the District of Columbia,

where Johnson has been detained since his conviction in April of 2019.  In the *Banks*

litigation, Judge Kollar-Kotelly appointed amici curiae to inspect the conditions of

incarceration at D.C. DOC facilities and, based on the ensuing report, she concluded

that "the infection rate in DOC facilities was over seven times the infection rate of the

District of Columbia at large[,]" and that social distancing regulations have not been

fully implemented due to severe understaffing of correctional officers and their

supervisors.  *Banks v. Booth*, No. 20-cv-849, 2020 WL 1914896, at *6–7 (D.D.C. Apr.

19, 2020).[8]  Finding specifically that detainees are not being properly screened and

quarantined, *see id.* at *8, Judge Kollar-Kotelly ordered a number of interim measures

to address the situation at D.C. DOC facilities, *see id.* at *13–15, but today's record

does not include information about the implementation of those measures, and this

Court rejects the government's suggestion that D.C. DOC's *prior* press statement about

what it was doing to address the COVID-19 threat is sufficient to counteract the clear

conclusion that the conditions of incarceration that Johnson is facing, as they currently

exist, create extraordinary and compelling reasons for a reduction in his sentence.  (*See*

Gov't Opp'n at 7–12.)

     The compelling need for Johnson, in particular, to be released from D.C. DOC

custody relates primarily to Johnson's heightened risk of having serious medical

complications if he were to contract COVID-19.  The health records that this Court has

received and reviewed, both from D.C. DOC and defense counsel, plainly indicate that

Johnson suffers from serious preexisting conditions, including pulmonary hypertension

---

[8] In *Banks*, detainees brought a constitutional challenge against the District of Columbia regarding the conditions of their confinement in light of the spread of COVID-19 inside the D.C. DOC facilities.  *See Banks*, 2020 WL 1914896, at *1–2.  Granting the plaintiffs' motion for a temporary restraining order, Judge Kollar-Kotelly found that the plaintiffs were likely to succeed on the merits of their claims that jail officials "knew or should have known that the jail conditions posed an excessive risk to [plaintiffs'] health," and that "the jail conditions exposed [plaintiffs] to an unreasonable risk of serious damage" and that "Defendants acted with deliberate indifference in posing such a risk."  *Id.* at *6–11.

and obesity.  (*See* Medical Records at 21–22, 27.)  The Centers for Disease Control and Prevention has specifically stated that hypertension is "associated with increased illness severity and adverse outcomes" in COVID-19 patients, *see Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19)*, Ctrs. for Disease Control & Prevention (Apr. 3, 2020), and it has also indicated that "severe obesity" can put people "at higher risk for complications from COVID-19[,]" *see Groups at Higher Risk for Severe Illness*, Ctrs. for Disease Control & Prevention (May 12, 2020).[9]  (*See also* Def.'s Reply at 9–10.)  Johnson is currently taking multiple prescribed medications for his heart condition, which is indicative of the degree of his medical needs, and, in light of the risks posed by COVID-19, this Court finds that this serious and permanent medical condition is sufficient to "diminish[]" Johnson's ability "to provide self-care within the environment of a correctional facility" for purposes of the Sentencing Commission's policy statement, U.S.S.G. §1B1.13, cmt. n.1(A)(ii) (2018), such that it provides an extraordinary and compelling reason that warrants Johnson's compassionate release, *see United States v. Lacy*, No. 15-cr-30038, 2020 WL 2093363, at *6 (C.D. Ill. May 1, 2020) (granting compassionate release to a defendant with hypertension, obesity, and diabetes, on the grounds that "[a]ny one of these three factors alone would increase the serious risks of COVID-19").

But there is even more at stake with respect to the risks to Johnson's health.  The Sentencing Commission's policy statement also plainly indicates that a defendant's *mental* health needs may also be the basis for granting compassionate release, and this Court further finds that Johnson's diagnosed PTSD makes his release request especially

---

[9] The cited sources have been archived at the time of this writing.  The first may be accessed at https://perma.cc/8QJQ-7NXJ, and the second may be accessed at https://perma.cc/5NYD-53ZQ.

compelling.  To be sure, any inmate who is at a higher risk of serious illness or other complications from COVID-19 faces challenges in caring for himself in prison when it comes to protecting from this coronavirus or exercising self-care if he contracts COVID-19.  But one can only imagine that the challenges of self-care inside a prison where COVID-19 is raging would be especially severe for someone who suffers from PTSD in addition to his physical vulnerabilities.  *Cf. Doe v. Barr*, No. 20-cv-02141, 2020 WL 1820667, at *4, *9 (N.D. Cal. Apr. 12, 2020) (ordering the release of a foreign national, detained in a county jail awaiting for his removal proceedings, in part because he suffers from PTSD and "[g]rowing evidence demonstrates that PTSD, anxiety/stress, and depression can lead to decreased immune response and increased risk of infections" and thus "compound his susceptibility" to COVID-19).  And this Court agrees with defense counsel that, in Johnson's case in particular, the mental and physical stress of being detained under the conditions of confinement that are described in *Banks*, while dealing with established and serious physical and mental health issues, almost certainly thwarts Johnson's ability to provide the type of self-care within the prison environment that is needed now more than ever.  (*See* Def.'s Mot. at 13–14.)[10]

All of this leads the Court to conclude that the current COVID-19-related conditions in D.C. DOC facilities, along with Johnson's particular mental and physical

---

[10] The *Banks* opinion describes the harrowing conditions inside D.C. DOC correctional facilities, and detainees' fervent efforts to protect themselves from catching COVID-19, in vivid terms.  "In some units, cleaning supplies were depleted and, in other units, inmates could not access the supplies to clean their cells[,]" and because "no inmates had facility-issued rags for cleaning their cells[,]" "many inmates used 'tattered and soiled' rags that they made by tearing facility issued towels or t-shirts." *Banks*, 2020 WL 1914896, at *9 (internal citations omitted).  Moreover, when it comes to personal protective equipment, although "[i]nmates housed in quarantine units are [] required to wear masks outside their cells[,]" "many of the masks did not fit and were soiled." *Id.* at *10 (internal citations omitted).  And, with respect to personal hygiene, "[t]hose in the isolation units are not permitted to shower" and laundry services "have been limited with some inmates wearing the same soiled clothes for the duration of their stay in isolation." *Id.* (internal citations omitted).

health conditions, constitute "extraordinary and compelling reasons [that] warrant [] a reduction" in Johnson's term of incarceration within the meaning of both section 3582(c)(1)(A)(i) of Title 18 of the United States Code and section 1B1.13 of the Sentencing Guidelines Manual.

### C. The Purposes Of Punishment Set Forth In Section 3553(a), Including Public Safety, Do Not Require Maintenance Of Johnson's Original Sentence

As explained above, even if there are extraordinary and compelling reasons to reduce a defendant's term of imprisonment, the Court must reassess the sentencing factors that Congress established at 18 U.S.C. § 3553(a) to the extent applicable, including the need for the sentence imposed "to protect the public from further crimes of the defendant," 18 U.S.C. § 3553(a)(2)(C), and any such reduction must likewise be consistent with the Sentencing Commission's expressed policy concern about the release of dangerous offenders, *see* U.S.S.G. § 1B1.13(2) (stating that, before granting a motion for compassionate release, courts should make a finding that "the defendant is not a danger to the safety of any other person or to the community"). In this regard, Johnson's motion for compassionate release stresses that "Mr. Johnson was on pretrial bail for three and a half years while his case was pending in this Court, suggesting that incarceration is not necessary to protect the public from further crimes of the defendant" (Def.'s Mot. at 10 (internal quotation marks and citation omitted)), and it also argues that the Court's prior assessment of the section 3553(a) factors that yielded a 41-month prison term does not suggest that Johnson's crimes "warrant a 41-month sentence served in conditions that expose Mr. Johnson to a highly contagious virus that can cause serious illness or death" (*id.* at 9 (citations omitted)). For its part, the government maintains that Johnson's "crimes in this case were serious" and that "[t]he

evidence at trial . . . demonstrated his intense obsession with procuring these weapons of war[.]"  (Gov't Opp'n at 12–13.)

This Court has reflected on the applicable statutory sentencing factors—including "the nature and circumstances of the offense[,]" 18 U.S.C. § 3553(a)(1), "the history and characteristics of the defendant[,]" *id.*, and "the need for the sentence imposed . . . to protect the public from further crimes of the defendant," *id.* § 3553(a)(2)(C)—and it is confident that none of these factors is an impediment to the compassionate release reduction that the current extraordinary and compelling circumstances warrant for several reasons.  First and foremost, with respect to the nature and circumstances of Johnson's offenses of conviction, it is important to recall that this case presented a peculiar situation, insofar as the government superseded the indictment several times over a period of years in the course of engaging in plea negotiations with Johnson, all while Johnson was out of jail on pretrial release.  (*See* Indictment, ECF No. 1; Superseding Indictment, ECF No. 14; Superseding Indictment, ECF No. 70.)  Despite the intensifying pressure, Johnson never cooperated, and his co-defendant—a notorious Swedish arms dealer who was under investigation prior to any charges being brought against Johnson—was never brought to trial.  And while multiple serious charges that were ultimately brought against Johnson were certainly proven at trial, *see generally Johnson*, 2019 WL 3842082, at *1 (D.D.C. Aug. 15, 2019) (discussing Johnson's conviction on two counts of unlawful receipt or possession of an unregistered firearm, two counts of unlawful making of a firearm, two counts of possession of a weapon of mass destruction, and one count of conspiracy to smuggle machine guns and silencers into the United States), on their face, and given the evidence presented, the offenses of conviction overstate the seriousness of Johnson's

offense conduct.

With respect to Johnson's possession of two 37-millimiter modified shell casings, law enforcement officers found both items buried in a box that had been stored in the basement of the home in which Johnson was residing.  "The federal statutory definition of destructive device is quite similar to the definition of weapon of mass destruction in the D.C. Code" in that both definitions "include[] a nonfunctional device or a combination of parts that can quickly and easily be converted into a functional destructive device." *Johnson*, 2019 WL 3842082, at *3 (citations omitted).  Thus, the seized items qualified under the applicable laws, but the circumstances of Johnson's possession of them and their discovery mitigate concerns that the shells were part of some dangerous plot on Johnson's part.

More troubling was the evidence concerning Johnson's apparent fascination with weapons and his history of communications with the Raimo Huolman, who appears to have been the true target of the federal law enforcement effort:  the search history on Johnson's personal computer revealed a number of inquiries concerning explosive devices, and there was a trove of e-mail traffic that suggested that Johnson had, in fact, purchased silencers and other machine-gun-related equipment from Huolman in Sweden.  *See id.* at *1 n.1.  But no machine guns or illegal weapons parts were ever found in Johnson's possession.  And the various weapons parts at issue did not appear to be dangerous standing alone; in fact, they only technically satisfied the definition of a machine gun insofar as "a collection of parts designed and intended to convert a weapon into a machine gun [are] the functional equivalent of a machine gun" under federal law.  *United States v. Syverson*, 90 F.3d 227, 230 (7th Cir. 1996) (internal quotation marks omitted).  (*See also* Trial Tr. at 806–810, Apr. 23, 2019, ECF No. 152

(including an expert's testimony explaining that a particular "piece of metal" was considered a "machine gun" under the National Firearms Act because it "converts a semiautomatic weapon into a machine gun").)

Thus, while it is clear that Johnson was rightly convicted of inherently dangerous offenses, the evidence did not suggest that Johnson himself was a danger to the community, nor was there necessarily a "need for the sentence imposed . . . to protect the public from further crimes of the defendant[.]" 18 U.S.C. § 3553(a)(2)(C). This is largely why the Court based Johnson's sentence primarily on just punishment and deterrence, and also why it released him pretrial pursuant to section 3142(g). In short, the evidence with respect to the explosive devices was simply that Johnson, who had lots of lawful hobbyist materials in his basement, had once made the two improvised 37-millimiter shells at some point in the past, and the evidence admitted at trial does not support a reasonable inference that he had any specific plan to use these two devices to cause harm to anyone. And with respect to the conspiracy to smuggle machine guns and silencers into this country, the evidence was damning, but it was also entirely circumstantial—*i.e.*, it consisted solely of e-mails and website invoices. Despite multiple searches of Johnson's residence, none of the materials were ever recovered, and the government presented no evidence of the ultimate disposition of these items, even assuming that Johnson was actually able to bring the materials for which he was bargaining into the United States. Moreover, given the fact that Johnson had no criminal history prior to the events at issue in this case, and also that there is no indication that Johnson committed any other weapons-related crimes at any point during the lengthy period of his pretrial supervision, this Court concludes that the trial evidence alone does not support a reasonable inference that Johnson needs to be

incarcerated in order to protect the public from his future crimes.

Johnson's history and characteristics are another key reason why the Court believes that Johnson has now served a sufficient period of incarceration to promote the purposes of punishment.  As noted earlier, Johnson is a military veteran who was honorably discharged after serving his country during two tours in Afghanistan, and he now suffers from PTSD.  (*See* Def.'s Opp'n to Gov't Mot. for Pretrial Detention, ECF No. 27 at 3–6.)  Johnson has no criminal history, significant physical and mental health needs, and strong ties to the District of Columbia, including the emotional support of his mother (with whom he lived) and other family members.  (*Id.* at 6.)

The bottom line is this: the Court initially sentenced Johnson to 41 months of imprisonment—the bottom of the applicable guideline range after a departure for military service and PTSD—largely due to the fact that, although his offenses were serious, his personal history and characteristics strongly suggested that any term of imprisonment longer than the low-end of the applicable guideline range would have been greater than necessary to comply with the purposes of punishment.  Today, in the age of COVID-19, the Court's concerns about Johnson's mental and physical health, and the absence of any indication that he poses an actual danger to the community, suggest that the purposes of punishment are satisfied by the term of imprisonment that he has already served (approximately 14 months), plus a period of supervised release that includes home incarceration as well as conditions that require Johnson to continue mental health and substance abuse treatment and that restrict his ability to use a computer to engage in any illegal weapons-related transactions.[11]

---

[11] Notably, although Johnson's motion asks this Court to "order[] that Mr. Johnson serve the balance of his sentence in home confinement" (Def.'s Reply at 14), it is this Court's view that section 3582(c)

## III.   CONCLUSION

The sentence that this Court previously imposed on Morris Johnson was consistent with the Sentencing Guidelines and the Court's evaluation of the applicable section 3553(a) factors, but it did not, and could not, envision requiring Johnson to serve the sentence while "incurring a great and unforeseen risk of severe illness or death brought on by a global pandemic." *United States v. Zukerman*, No. 16-cr-194, 2020 WL 1659880, at *6 (S.D.N.Y. Apr. 3, 2020) (internal quotation marks and citation omitted).   For the reasons explained above, Johnson has now demonstrated that the COVID-19 pandemic, coupled with his serious preexisting underlying medical conditions, presents an extraordinary and compelling reason to reduce the previously imposed 41-month term of imprisonment.   Moreover, under the circumstances presented in this case, it is clear to the Court that continued detention would now be greater than necessary to comply with the purposes of punishment, based on the Court's reexamination of the section 3553(a) factors and the Sentencing Commission's stated policy concerns about the release of dangerous offenders.   Accordingly, in its Order

---

does not provide authority to order such a relief.  Indeed, per the plain terms of that provision, the only relief that this Court may provide to a defendant who qualifies for compassionate release is to "reduce the term of imprisonment" and, if appropriate, "impose a term of probation or supervised release with or without conditions[.]"  18 U.S.C. § 3582(c)(1)(A).  However, there is no doubt that section 3583(e)(2) authorizes this Court to "modify, reduce, or enlarge the conditions of supervised release, at any time prior to the expiration or termination of the term of supervised release," 18 U.S.C. § 3583(e)(2), and it appears that, in the compassionate release context, the length of any modification to a term of supervised release may not "exceed the unserved portion of the original term of imprisonment[,]" *id.* § 3582(c)(1)(A).  Therefore, because the purposes of punishment would be satisfied by releasing Johnson at this time and placing him on a period of location monitoring and computer monitoring, the Court's order reduced Johnson's prison term to a sentence of time served pursuant to section 3582(c)(1), and then further modified the previously imposed 60-month term of supervised release, pursuant to the Court's authority under section 3583(e)(2), to include a condition of home incarceration with location monitoring, for the maximum practical period recommended by the U.S. Probation Office, and 22 months of computer monitoring (a period that equaled the remaining unserved portion of the original term of imprisonment).  (*See* Order Granting Def.'s Mot., ECF No. 219 at 1–3.)

dated April 29, 2020, this Court granted Johnson's emergency motion for release

pursuant to its authority under section 3582(c)(1)(A)(i), and it amended its prior

judgment to reflect a sentence of time served to be followed by a 60-month period of

supervised release, including a 6-month period of home incarceration and a 22-month

period of computer monitoring.


DATE:  May 16, 2020                     *Ketanji Brown Jackson*
                                        KETANJI BROWN JACKSON
                                        United States District Judge